In re AUTHORIZATION TO DIS-CHARGE AND CONSTRUCT WASTE-WATER TREATMENT FACILITIES Under the National Pollutant Discharge Elimination System and State Disposal System Permit Program.

No. C9–84–1818.

Court of Appeals of Minnesota.

March 26, 1985.

Bronson C. LaFollette, Wis. Atty. Gen., Carl A. Sinderbrand, Asst. Atty. Gen., Madison, Wis., David E. Krause, Krause & Rollins, Minneapolis, for relator State of Wis.

Hubert H. Humphrey, III, Minn. Atty. Gen., Eldon G. Kaul, Asst. Atty. Gen., Roseville, Marlene E. Senechal, Minneapolis, for respondent Minnesota Pollution Control Agency.

Robert A. Hillstrom, Minneapolis, Mark D. Thompson, St. Paul, for respondent Metropolitan Waste Control Com'n.

William E. Flynn, Minneapolis, Karen A. Schaffer, St. Paul, for respondent Metropolitan Council.

Brian J. Love, Arthur, Chapman & Michaelson, Minneapolis, for amicus curiae Izaak Walton League of America, Inc.

Heard, considered and decided by POPOVICH, C.J., and NIERENGARTEN and CRIPPEN, JJ.

## OPINION

POPOVICH, Chief Judge.

The State of Wisconsin appeals certain provisions of three combined sewer over-

flow discharge permits granted by the Minnesota Pollution Control Agency (MPCA). Wisconsin claims (1) the MPCA permits do not require compliance with applicable state and federal law, (2) the permits do not require a minimum level of facilities planning necessary to comply with federal and state law, (3) the MPCA failed to correct recognized ambiguities in the permits, and (4) the permits irrationally require implementation of the facilities plan before receipt of necessary approvals. We affirm.

## FACTS

The cities of Minneapolis, St. Paul and South St. Paul, like many older cities in the U.S., were originally served by combined sewer systems. These original combined sewer systems were constructed prior to 1900, before sanitary wastes were conveyed to a treatment plant for treatment prior to discharge. Their purpose was to convey sanitary wastewater and storm water directly to the Mississippi River. After the Metropolitan Wastewater Treatment Plant was constructed, interceptor sewers were constructed to convey the wastewater flow to the plant for treatment prior to discharge.

The interceptor sewers, however, do not have the capacity to convey all wastewater flows to the plant during wet weather conditions. During wet weather conditions, therefore, the excess volume of combined sanitary wastewater and storm water is directed away from the plant and is discharged untreated into the Mississippi River. This discharge of untreated combined flow (sanitary wastewater and storm water) is called combined sewer overflow (CSO).

The impact of CSO on the water quality of the Mississippi River essentially precludes the safe use of the affected Metropolitan Area segment as a swimmable water. Presently the water quality standard of fecal coliform organisms (the indicator

used to determine whether a water is bacteriologically suitable for swimming) is often violated in the Mississippi River between the first combined sewer outfall in North Minneapolis to the Hastings Dam.

In addition to water quality problems associated with CSO, combined sewer systems also cause other problems. Hydraulic overloading of combined sewers can result in sewage backup into homes and localized flooding during wet weather conditions.

In order to overcome the various problems associated with combined sewer systems, Minneapolis, St. Paul and South St. Paul have begun converting their combined sewer systems to separated sewer systems.[1] Minneapolis has converted approximately 87% of its combined sewers to separated sewers. Approximately 40% of St. Paul and 35% of South St. Paul are still served by combined sewers.

The MPCA's strategy regarding water quality problems in the Metropolitan Area stretch of the Mississippi River has been to deal with the Metropolitan Wastewater Treatment Plant before dealing with CSO because the water quality impacts of the Treatment Plant were much greater than those of CSO. The MPCA has required the Metropolitan Waste Control Commission (MWCC) and the Metropolitan Council to expand and upgrade the Metropolitan Wastewater Treatment Plant. Consequently, compliance with water quality standards in the Metropolitan stretch of the Mississippi River (except for violations of water quality standards for fecal coliform organisms primarily attributable to CSO discharges) has improved markedly. Therefore, the MPCA has now moved into the second phase of its strategy which is addressing water quality problems associated with CSO discharges. The MPCA has addressed the problems associated with CSO in the Metropolitan Area through the development and issuance of CSO permits.

1. "Separated sewer systems" are composed of a "sanitary sewer system", which carries only san-

itary wastewater and minor quantities of infil-

The three MPCA-issued permits[2] which are the subject of this appeal require the control and abatement of combined sewer overflow in the Metropolitan Area. The permits authorize the permittees to discharge from their combined sewer outfalls to the Mississippi River in accordance with the requirements of the permits. The permits include a requirement that the permittees develop, adopt, and initiate implementation of a comprehensive CSO Control Plan. The objective of the CSO Control Plan is the elimination of CSO as a cause of noncompliance with water quality standards in the Metropolitan stretch of the Mississippi River. The key elements of the CSO Control Plan are set out in the permit.

The permits provide for the development of consensus among the permittees as to the preferred alternative for CSO control. To achieve this consensus, the permits provide for incremental development of the CSO Control Plan by the various permittees in accordance with their statutory and regulatory authority. The final CSO Control Plan is subject to MPCA approval.

The permittees must initiate implementation of the CSO Control Plan by June 30, 1986, the date the permits expire. These CSO permits are the first phase of a two phase permit process. The second phase will involve the issuance of new permits with a detailed schedule for the implementation of the CSO Control Plan.

The permits were developed over a 16 month period during which public participation was actively solicited and public concerns were considered by the MPCA. Wisconsin was involved throughout the permit development process but withdrew its request for a contested case hearing. The permits were modified to include conditions which were responsive to objections made by Wisconsin in regard to previous CSO permits issued by the MPCA. The EPA, which has veto power over these permits, indicated it will not veto the issued permits.

## ISSUES

1. Did the MPCA require the development of a facility plan that may not ensure compliance with applicable state and federal regulatory requirements?

2. Did the MPCA err by not requiring the facility plan to include federal facilities planning requirements necessary to obtain federal funding for the construction of CSO abatement projects?

3. Did the MPCA act arbitrarily and capriciously by failing to correct alleged ambiguities in the permits?

■ 4. Do the issued permits erroneously require the implementation of the facility plan before receipt of necessary approvals?[3]

## ANALYSIS

1. *Lack of Written Findings and Reasons.*

■ The nature of the record in this appeal is less than satisfactory because the MPCA did not make any written findings or conclusions when issuing the permits. Normally, an agency decision not supported by written findings and conclusions will be held arbitrary and capricious because the decision "represents the agency's will rather than its judgment." *Peoples*

---

tration and inflow, and a "storm sewer system", which carries only storm water.

2. The three permits are as follows: MN 0046744 (permittees: City of Minneapolis, Metropolitan Council and Metropolitan Waste Control Commission); MN 0025470 (permittees: City of St. Paul, Metropolitan Council and Metropolitan Waste Control Commission); and MN 0047511 (permittee: City of South St. Paul).

The provisions of the Minneapolis and St. Paul permits are, to the extent relevant to this appeal, identical. Except for those provisions which apply to the Metropolitan Council or the MWCC, the provisions of the Minneapolis and St. Paul permits are essentially the same as those of the South St. Paul permit. In its brief, Wisconsin has referred to the Minneapolis permit and, therefore, the balance of the discussion herein also refers to the provisions of the Minneapolis permit.

3. The parties also raised the issue of Wisconsin's standing to bring this appeal. We determine this appeal on the merits as a matter of comity between sister states.

*Natural Gas Company v. Minnesota Public Utilities Commission,* 342 N.W.2d 348, 352 (Minn.Ct.App.1983), *pet. for rev. denied,* (Minn. Apr. 24, 1984); *see Markwardt v. State Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977).

■ Had this matter arisen from a contested case proceeding, the MPCA would have been compelled to provide written reasons for its decision under Minn.Stat. § 14.62, subd. 1 (1984), which states:

Every decision and order rendered by an agency in a contested case shall be in writing, shall be based on the record and shall include the agency's findings of fact and conclusions on all material issues.

*Id.* Although this appeal did not arise from a contested case, the MPCA should still have provided written reasons for its decision. *See Reserve Mining Co. v. Minnesota Pollution Control Agency,* 364 N.W.2d 411, 415 (Minn.Ct.App.1985).

In *Reserve,* this court was faced with a similar situation where the MPCA issued pollution discharge permits without providing written reasons for its decision. We stated:

[A]n agency decision should normally be supported by written findings and reasons, in more than just a conclusory fashion, before expecting the order or decision to be sustained on appeal.

*Id.* at 415. This holding was based on our belief that an agency decision not supported by written findings and reasons is (1) inherently arbitrary, (2) "unfair to the appealing party," and (3) "highly impractical for the reviewing body." *Id.* at 414.

This "court is interested in determining the collective reasons of an agency's action as enunciated by the agency." *Id.* This is not possible without written findings and reasons. We have decided to determine this matter on the merits, however, because (1) these permits were issued before our holding in *Reserve,* (2) the State of Wisconsin had the opportunity to and did request a contested case hearing but withdrew its request, and (3) both parties argued during oral argument that remanding this matter for factual findings and written reasons is not necessary because the issues are essentially legal in nature.

■ Although we have decided to address the substantive merits of this appeal despite our misgivings about the state of the record and lack of written findings, we reaffirm our intention to strictly and firmly apply the requirement of written findings and reasons for agency decisions in the future.

[A]n agency consisting of more than one member should arrive at a decision and adopt findings and reasons for it in an appropriate collective action or resolution contemporaneously with the decision.

*Id.* at 415; *see also Honn v. City of Coon Rapids,* 313 N.W.2d 409, 416 (Minn.1981).

2. *Compliance with State and Federal Law.*

Wisconsin claims a portion of Part I.E.2. of the permits does not require the development of a facility plan that will ensure compliance with applicable state and federal regulatory requirements. Wisconsin proposes the following:

The CSO Control Plan shall represent an implementable solution that will eliminate *CSO sewage overflows* as a cause of noncompliance with water quality standards in the Metropolitan Stretch of the Mississippi River.

Wisconsin's argument is basically as follows: (1) the permittees are committed to sewer separation as the means of abating CSO; (2) once sewer separation is completed, no CSO will exist by definition; (3) sanitary sewers may overflow after separation is completed; (4) thus, the MPCA erred by not requiring the Control Plan to plan to eliminate possible sanitary sewer overflows.

■ Wisconsin's claim is speculative and meritless. No evidence was presented to show that sanitary sewers will overflow after separation is completed. Moreover, the lack of specific language in these permits does not mean the permits violate state and federal law or that the MPCA

would permit untreated sewage from sanitary sewers to be dumped in the Mississippi. Under Minn.R. 7050.0210, subpts. 1, 6 (1983), "No untreated sewage shall be discharged into any waters of the state. * * [T]he agency shall require secondary treatment as a minimum for all municipal sewage * * *." *Id.*

Although Wisconsin's proposed language may have been better than the language used by the MPCA, this court may not substitute its judgment for that of the agency.

> Where there is room for two opinions on the matter, such action is not 'arbitrary and capricious,' even though it may be believed that an erroneous conclusion has been reached.

*Village of Goodview v. Winona Area Industrial Development Association,* 289 Minn. 378, 381, 184 N.W.2d 662, 664 (1971).

### 3. *Federal Facilities Planning.*

Wisconsin claims the MPCA erred by issuing permits which do not require compliance with federal facilities planning requirements necessary to obtain federal funding of the project. It urges this court to modify the permits to include language requiring compliance with the minimum facilities planning requirements of section 201 of the federal Clean Water Act, 33 U.S.C.A. § 1281 (1978 & Supp.1984). Wisconsin claims the failure to require this planning will result in loss of federal funding, CSO control alternatives will not be evaluated, and there will not be enough information for the MPCA to determine whether to prepare an environmental impact statement. The issued permits allow but do not require this type of facilities planning.

Respondents claim the issued permits were more reasonable because federal facilities planning would delay the implementation of a CSO abatement plan without assuring federal funding for the project. The EPA has never approved a CSO solution in effect in a major city. Should the EPA approve the solution, there is no certainty that federal funds will be available.

The MPCA believes the issued permits and planning process will provide enough information to evaluate CSO control alternatives and decide whether an environmental impact statement is necessary.

■ This issue is a classic policy decision where two different reasonable conclusions may be reached. Thus, the MPCA's decision not to require federal facilities planning in the permits cannot be considered arbitrary and capricious. *Village of Goodview,* 289 Minn. at 381, 184 N.W.2d at 664.

### 4. *Alleged Ambiguities.*

Wisconsin further claims the MPCA acted arbitrarily and capriciously by failing to correct certain alleged ambiguities in the permits. Wisconsin seeks modification of Part I.E.2., paras. B. and C. as follows:

B. The MWCC Chief Administrator shall submit to the MPCA the recommended CSO control Plan which ~~considers and incorporates~~ takes into account the City Plan for CSO Control. In the event the MWCC Chief Administrator's recommended City Plan varies from, or is inconsistent with the recommended City Plan for CSO Control, the MWCC Chief Administrator shall, within thirty (30) days of submittal, provide to the MPCA and the City a written explanation of the reasons for each variance or inconsistency.

C. The City shall adopt and submit to the MPCA and the MWCC a Comprehensive Sewer Plan which ~~incorporates~~ fully adopts the MWCC Chief Administrator's recommended CSO Control Plan as it relates to the City.

Wisconsin claims the failure to make the proposed change in paragraph B. is arbitrary and capricious because the term incorporate does not contemplate variances and inconsistencies between the MWCC plan and the cities' plans. Wisconsin also claims the rejection of changes in paragraphs B. and C. was arbitrary and capricious because the MPCA agreed to make these changes if Wisconsin would drop its

objections to not requiring compliance with federal facilities planning requirements.

■ These criticisms of the MPCA permit do not show the MPCA was arbitrary and capricious. At most, they show a difference of opinion. The MPCA did not abuse its discretion by refusing to make these changes.

5. *Receipt of Necessary Approvals.*

Wisconsin claims the MPCA erred because the permits do not require approval of the 208 plan [4] and the control plan prior to implementation. Wisconsin requests the following modifications to Part I.E.2. of the permits:

E. The Metropolitan Council shall complete <u>and submit to MPCA and EPA for approval</u> the amendment of the Water Resources Management Development Guide/Policy Plan (208 Plan) to address CSO control in the seven county Metropolitan Area.    September 15, 1985

F. <u>The City shall adopt and submit to MPCA and MWCC revisions to the Comprehensive Sewer Plan as needed to conform to the approved Water Resources Management Development Guide/Policy Plan (208 Plan).</u>    December 31, 1985

G. The Metropolitan Waste Control Commission shall formally adopt <u>and submit to MPCA and EPA for approval</u> the CSO Control Plan.    ~~December 31, 1985~~ January 31, 1986

H. The Joint Permittees shall initiate implementation of the <u>MPCA and EPA approved</u> CSO Control Plan.    June 30, 1986

Wisconsin's position is essentially that the MPCA and the permittees will violate the law unless explicitly foreclosed from doing

so by the language of the permits. Respondents claim inclusion of every applicable statute or regulation in the permits is not possible or necessary.

■ Respondents claim inclusion of a requirement that the permittees submit a 208 plan to the MPCA and EPA for approval is not necessary because this requirement is provided by statute. *See* 33 U.S.C.A. § 1288(b)(3) (1978). Respondents' position is correct. The requirements Wisconsin seeks to inject are required under statute and regulation. The MPCA's CSO permits must be consistent with the 208 plan regardless of whether the permits contain explicit language to this effect. *See* 33 U.S.C.A. § 1288(e) (1978); 40 C.F.R. § 122.-4(g) (1984).

Wisconsin's second contention under this argument is that the permits require implementation of the CSO control plan prior to MPCA and EPA approval. Again, Wisconsin's position assumes respondents will not follow the clear requirements of applicable law.

■ The MPCA is also required to approve the facilities plan prior to implementation. *See* Minn.Stat. § 115.07, subd. 3 (1984). While the EPA has veto power, however, the EPA does not have "approval authority" over these permits. *See District of Columbia v. Schramm*, 631 F.2d 854 (D.C.Cir.1980). Thus, a specific provision for MPCA approval was unnecessary, and a similar provision for EPA approval was not required.

■ The permits do not allow implementation of the CSO Control Plan prior to MPCA approval. The MPCA did not err by failing to include Wisconsin's suggested modifications.

---

**4.** A "208 plan" is an areawide waste treatment management plan under section 208 of the Clean Water Act, 33 U.S.C.A. § 1288 (1978), for an area identified by the state as having "substantial water quality control problems." 33 U.S.C.A. § 1288(a)(2) (1978). A 208 plan is essentially a policy-level plan for how a planning area will solve identified water quality control

problems. In the Twin Cities metropolitan area, the 208 planning agency is the Metropolitan Council. The water resources management portion of the Council's development guide and policy plan, adopted under Minn.Stat. §§ 473.-145–46 (1984), constitutes the area's 208 plan. The 208 plan is an enforceable requirement of the Clean Water Act.

## DECISION

The problems of CSO in the metropolitan area and the condition of the Mississippi River below the treatment plant have been long-standing. No longer should they continue unabated. Wisconsin is properly concerned and their involvement has stimulated increased interest in seeking a solution. All agencies and municipalities involved should proceed with dispatch. The holding here should not be construed as an approval of all past actions.

The issued permits require the development of a facility plan which will meet state and federal regulatory requirements. The MPCA properly excluded a requirement in the permits that would have required compliance with federal facilities planning requirements. The MPCA was not arbitrary and capricious by refusing to correct alleged ambiguities in the permits. The issued permits do not illegally implement the facility plan before required regulatory approvals are made.

Affirmed.