**NORTH AMERICAN WATER OFFICE, et al., Relators,**

v.

**LTV STEEL MINING CO., Minnesota Pollution Control Agency, Respondents.**

No. C4–91–1552.

Court of Appeals of Minnesota.

March 3, 1992.

Lawrence J. Coleman, St. Paul, for North American Water Office, et al.

Clay R. Moore, Mackall, Crounse & Moore, Minneapolis, for LTV Steel Mining Co.

Hubert H. Humphrey, III, Atty. Gen., Lisa R. Tiegel, Sp. Asst. Atty. Gen., St. Paul, for Minnesota Pollution Control Agency.

Considered and decided by FORSBERG, P.J., and KLAPHAKE and DAVIES, JJ.

## OPINION

FORSBERG, Judge.

Relators, three environmental organizations, seek review of a decision by the Minnesota Pollution Control Agency (MPCA) which granted an air emission permit to respondent LTV Steel Mining Company (LTV). Relators claim the MPCA erred by denying their request for a contested case hearing and/or the opportunity to comment on final amendments to the sulfur dioxide emission limits in the proposed permit. Relators also claim the MPCA's decision was arbitrary and capricious and violated state and federal laws. We affirm.

## FACTS

Respondent LTV is the owner of the Taconite Harbor Power Plant in Schroeder, Minnesota. The plant has two 1950's vintage coal-fired boilers and one 1960's vintage coal-fired boiler.

In 1982, the plant was placed on standby operation status, but in late 1989, LTV officials decided to reactivate the plant. In June 1990, LTV applied to the MPCA for the necessary air quality permit.

The MPCA published notice of intent to issue the draft permit, and established a public comment period of March 31, 1991 to April 30, 1991. The draft permit contained proposed sulfur dioxide emission limits for three contingencies: 2.34 lbs./million Btu if only one boiler were used; 1.17 lbs./million Btu if two boilers were used; and .78 lbs./million Btu if three boilers were used. All of the proposed limits were based upon a three hour average.

The MPCA conducted a public meeting in Schroeder on April 17, 1991, and the MPCA Air Quality Committee conducted an informational meeting in Saint Paul on April 22, 1991. In response to a request by the Project Environment Foundation, the MPCA extended the public comment period to May 23, 1991.

Additional meetings by the MPCA or its Air Quality Committee were conducted on May 7, June 24, and July 11, 1991. Numerous oral and written comments were presented to the MPCA by its staff and members of the public. Many of the comments concerned the sulfur dioxide limits in the draft permit.

On July 17, 1991, the MPCA conducted a Special Board Meeting and heard testimony by several individuals and organizations, including relator North American Water Office (NAWO). Again, much of the testimony concerned the proposed sulfur dioxide limits. During the hearing, a proposal was offered suggesting that, regardless of how many boilers were used, a maximum sulfur dioxide emission limit should be established at .78 lbs./million Btu.

Towards the end of the hearing, the MPCA questioned whether it would be possible for LTV to lower the proposed emission limits for sulfur dioxide. A representative from LTV replied that it would be possible if an interim period were established, during which time the plant operators could learn how to burn low-sulfur Western coal. .

During the July 17 meeting, the MPCA and LTV agreed upon two sets of sulfur dioxide limits: interim limits and permanent limits. Interim limits between July 1991 and July 1992 were set at 1.17 lbs./million Btu for one or two boilers and .78 lbs./million Btu for three boilers. A permanent limit, to become effective July 1992, was set at .78 lbs./million Btu, whether one, two, or three boilers were used.

After the lower sulfur dioxide limits were agreed upon, no further public comment was received by the MPCA. The MPCA voted in favor of the permit as amended, and determined MPCA staff should develop findings in support of the proposed permit. The MPCA intended to ratify the permit at its next regular board meeting without further public testimony.

On July 22, 1991, relator NAWO submitted a request to the MPCA for a contested case hearing "on the narrow question of whether [the plant's] boilers are physically capable of burning the high percentage of Western low-sulfur coal required for compliance with the permit amendment adopted by the MPCA on July 17, 1991." NAWO argued that the record contained no evidence on the issue of the plant's ability to burn low-sulfur Western coal. NAWO proposed that if a contested case hearing were held, expert witnesses would be called to present evidence on this issue.

On July 23, 1991, the MPCA met to consider its staff's findings of fact in support of the permit as amended. The MPCA considered NAWO's request for a contested case hearing, but concluded the request was untimely. The MPCA also declined to hear comments by a NAWO representative who attended the meeting. The MPCA voted to ratify the findings of fact and issue the permit as amended.

Relators have obtained a writ of certiorari, requesting review of the MPCA's decision.

## ISSUES

1. Did the MPCA err by denying relators' request for a contested case hearing and by modifying the draft permit without providing public notice and an opportunity to be heard?

2. Was the MPCA's decision arbitrary or capricious or affected by other errors of state and federal law?

## ANALYSIS

■ 1. Relators argue the MPCA erred by modifying the draft permit without providing public notice and an opportunity to be heard. Minn.R. 7000.1500, subpt. 1 (1991) provides:

> Upon request made prior to or at an agency meeting, any person who desires to present a statement on a matter that is on the agenda for the meeting, and for which no contested case or rulemaking hearing was held, must be afforded an opportunity to present an oral statement to the agency at the meeting.

Relators also argue the MPCA erred by denying their request for a contested case hearing. The MPCA is required to conduct a contested case hearing if it finds the following:

> A. that a person requesting the contested case hearing has raised a material issue of fact or of the application of facts to law related to * * * the terms of the draft permit; [and]
>
>    *    *    *    *    *    *
>
> C. that there is a reasonable basis underlying issues of fact or law raised by the person that requests the contested case hearing such that the holding of a contested case hearing would aid the agency in making a final determination on the permit application.

Minn.R. 7001.0130, subpt. 1 (1991). A party requesting a contested case hearing has the "burden of demonstrating the existence of material facts that would aid the agency." *In re NSP Red Wing Ash Disposal Facility,* 421 N.W.2d 398, 404 (Minn.App. 1988), *pet. for rev. denied* (Minn. May 18, 1988).

The MPCA denied NAWO's request to submit comments at the July 23 meeting because the MPCA had previously announced that no further comments would be allowed. The MPCA denied NAWO's request for a contested case hearing because the MPCA believed the request was untimely. *See* Minn.R. 7001.0110, subpt. 1 (1991) (suggesting that requests for contested case hearings should be submitted during the public comment period). *But cf.* Minn.R. 7000.1000, subpt. 2 (1991) (allowing any person to request a contested case hearing at an MPCA meeting if the matter is on the agenda). Relators claim that when the MPCA proposed amending the draft permit, the public comment period should have been reopened and their request for a contested case hearing should have been considered.

■ We need not decide whether the MPCA erred by refusing relators' requests for public comment or a contested case hearing, since we conclude any alleged wrongdoing failed to prejudice relators' rights. Following the public comment period, in response to environmental concerns, the MPCA lowered the maximum sulfur dioxide limits. Relators do not claim the limits are still too high. Instead, relators now speculate that the plant's boilers may not be capable of burning low-sulfur coal, and that such coal might not be available. These issues are premature.

The MPCA issued the permit to LTV with the understanding that LTV will need time to learn how to comply with the permit terms. The MPCA's findings clearly recognize the need for this learning process, and establish an interim period during which LTV's operators will acquire the necessary expertise. Following the interim period, LTV either will or will not be able to comply with the lower emission limits. If not, operation of the plant would violate the terms of the permit, requiring that the permit be modified or revoked. *See* Minn.R. 7001.0170; 7001.0180 (1991). The permit itself requires monitoring mech-

anisms to assure compliance with maximum emission limits, and LTV is required by statute to notify the MPCA of excessive or abnormal unpermitted emissions. Minn. Stat. § 116.061 (1990). In the event of emission violations, relators may file a complaint with the MPCA pursuant to Minn.R. 7000.0900 (1991).

■ 2. Relators argue the MPCA acted arbitrarily and capriciously by setting lower emission limits for sulfur dioxide in the absence of articulated findings or explanations. *See In re Authorization to Discharge and Construct Wastewater Treatment Facilities*, 366 N.W.2d 118, 121–22 (Minn.App.1985). In fact, however, the MPCA made extensive findings of fact, explaining: the sulfur dioxide emission limits which computer dispersion models predict would be necessary to meet state ambient air quality standards; the potential for those models to overpredict due to a failure to account accurately for the complex terrain surrounding the LTV site; LTV's inability to comply with the predicted limits without prohibitive expense; the maximum limits with which LTV could comply when burning coal with higher sulfur levels; the real potential for meeting lower limits by burning coal with lower sulfur limits; and the MPCA's belief that the permanent emission limit of .78 lbs./million Btu will assure compliance with all ambient air quality standards. These findings sufficiently explain the MPCA's reasons for its decision, and indicate that the decision did not reflect the MPCA's will, rather than its judgment. *See id.*

■ Relators also argue that the MPCA's decision violates state and federal laws, including the National Environmental Policy Act of 1969, 42 U.S.C.A. §§ 4321–4347 (West Supp.1991), the Clean Air Act Amendments of 1990, 42 U.S.C.A. §§ 7401–7671 (West Supp.1991), the Minnesota Environmental Policy Act, Minn.Stat. §§ 116D.01–.11 (Supp.1991), and the Minnesota Toxic Pollution Prevention Act, Minn. Stat. §§ 115D.01–.12 (Supp.1991). However, relators never claimed in their request for a contested case hearing that the amended sulfur dioxide emission limits were too high, or that the amended limits violated state or federal air standards. We will not consider issues that have been raised for the first time on appeal. *See Clapper v. Budget Oil Co.*, 437 N.W.2d 722, 727 (Minn.App.1989).

DECISION

Relators' challenge to the permit conditions is premature. The MPCA's decision is supported by the findings and is not arbitrary and capricious.

Affirmed.