### In the Matter of REICHMANN LAND AND CATTLE, LLP.

No. A13–1461.

Court of Appeals of Minnesota.

May 19, 2014.

Gary W. Koch, Matthew C. Berger, Gislason & Hunter LLP, New Ulm, MN, for relator Reichmann Land and Cattle.

Lori Swanson, Attorney General, Ann E. Cohen, Assistant Attorney General, St. Paul, MN, for respondent Minnesota Pollution Control Agency.

Considered and decided by CHUTICH, Presiding Judge;  CONNOLLY, Judge; and SMITH, Judge.

## OPINION

SMITH, Judge.

We affirm the order of respondent Commissioner of the Minnesota Pollution Control Agency (the MPCA) requiring relator, Reichmann Land and Cattle, LLP, to obtain a State Disposal System permit for its winter cattle lands because the lands are

not exempt from such a permit under the statutory definition of pasture. We reverse the commissioner's order requiring a federal National Pollutant Discharge Elimination System permit because Reichmann's operation is not an animal feeding operation as defined under federal law.

## FACTS

Reichmann operates a fifth-generation family farm in Pope County, Minnesota. The farm, which includes two registered feedlots and 4,000 acres of cropland, is located atop a highly productive aquifer that is especially vulnerable to manure deposits. Each winter, from approximately November or December until March or April, Reichmann places more than 2,000 beef cattle on approximately 400 acres of its cropland. The resulting cattle density is several times higher than that on a typical foraging field and, although there is at least an initial vegetative cover, Reichmann provides its cattle with feed that supplies at least 90 percent of their nutritional needs.

The winter feeding fields are divided into four tracts: tract one is approximately 215 acres; tract two is approximately 29 acres, divided into several parcels or pens; tract three is approximately 78 acres; and tract four is approximately 94 acres. Tract two is steeply sloped and surrounded by a system of engineered berms and buffers. An intermittent stream runs from west to east amidst these four tracts. This stream is joined by a second intermittent stream in tract two. In the past, Reichmann has discharged pollutants into these streams. These streams flow into a creek which has been designated an "impaired water" due to *E. coli* bacteria and dissolved oxygen levels. This creek joins the Sauk River, which empties into the Mississippi River at St. Cloud.

In and around Pope County, crop fields are typically tilled, and crops planted, between late April and early June; the growing season continues until the first frost, sometime in the fall. Every year, Reichmann removes all cattle from its winter feeding fields prior to the normal planting season, and it tills the soil and plants crops on the winter feeding fields at the same time as other crop fields in the area. The crops that are planted on the winter feeding fields are sustained throughout the summer growing season and are harvested at the same time as other similar crops in the area.

In 2008, Pope County adopted an ordinance that requires a permit for winter feeding. In 2009, Reichmann failed to obtain a permit, and was fined. Since 2010, Reichmann has obtained a county permit; it is the only operation that has sought a winter feeding permit from the county. The MPCA cannot enforce the Pope County permit. In February 2010, the MPCA notified Reichmann that its "winter feeding" operation required a National Pollutant Discharge Elimination System (NPDES) permit and a State Disposal System (SDS) permit, because it was discharging pollutants and it was an "animal feeding operation" (AFO) under federal law or an "animal feedlot" under state law. Reichmann disputed the necessity of an NPDES/SDS permit, arguing that it was not an AFO and that it fell within a state statutory exemption for "pasture." The following year, in March, the MPCA sent Reichmann a draft Administrative Order that would require Reichmann to terminate its winter feeding operation or obtain an NPDES/SDS permit. Reichmann petitioned for a contested case hearing, and both parties moved for summary judgment. The administrative-law judge (ALJ) denied both motions and ordered the parties to prefile written direct testimony of their witnesses. Following a five-

day administrative hearing, the ALJ recommended affirming the draft Administrative Order. Specifically, the ALJ concluded that, under federal law, Reichmann's winter feeding fields are an "animal feeding operation" because "during the time the animals are present, a vegetative cover of crop residue is not sustained," and because "crops or crop residue is not 'sustained' in the 'normal growing season,' but only for a part of the growing season after a crop is planted and it grows." Additionally, the ALJ concluded that Reichmann's winter feeding fields do not qualify for the state pasture exemption because " 'the concentration of animals is such' that a vegetative cover of crops is not maintained 'during the growing season,' " and because the cattle are not " 'allowed to forage on agricultural land.' "

When the Commissioner of the MPCA began his review, he determined that the ALJ record was missing several pre-trial pleadings. The commissioner contacted the Chief ALJ requesting either the missing documents or a 45–day extension, so that the commissioner could obtain the documents from the parties before making a final decision. The Chief ALJ granted the extension, noting that the ALJ who issued the report "has retired and after a thorough search we are unable to locate the referenced documents."

Reichmann independently reviewed the contents of the record, and discovered that all of its prefiled testimony was also missing. In response, the commissioner ordered the parties to review the record before him and "jointly confer on whether" he had "a complete record from the proceedings." The parties determined that, after providing copies of the previously identified items, the record was complete. Reichmann challenged the fairness of the hearing based on the gaps in the record, and the commissioner permitted legal argument on this issue. The commissioner

then sought and received a second extension of 21 days.

On July 15, 2013, the commissioner issued his final order, affirming the draft Administrative Order, adopting the ALJ report with certain modifications, and concluding that the ALJ report "was not made upon improper and unlawful procedure" and that "Reichmann has been provided adequate due process of law in this matter."

## ISSUES

I. Did the commissioner err by requiring Reichmann to obtain a state SDS permit for its winter feeding fields?

II. Did the commissioner err by requiring Reichmann to obtain a federal NPDES permit for its winter feeding fields?

III. Does the temporary absence of Reichmann's prefiled testimony from the record warrant relief?

## ANALYSIS

We review a final decision of the MPCA under the Administrative Procedures Act (APA). *In re Request for Issuance of SDS General Permit*, 769 N.W.2d 312, 316–17 (Minn.App.2009). Under the APA, we may affirm the commissioner's decision, remand the case for further proceedings, or reverse or modify the decision if the petitioner's substantial rights may have been prejudiced because the findings, inferences, conclusions, or decision are affected by an error of law, unsupported by substantial evidence, or are arbitrary and capricious. Minn.Stat. § 14.69 (2012). "On appeal, the party challenging the agency's decision has the burden of proof." *In re Request for Issuance of SDS General Permit*, 769 N.W.2d at 317.

### I.

■ Under Minnesota law, when a federal NPDES permit is not required, a

state SDS permit is generally required for "an animal feedlot or manure storage area that has been demonstrated not to meet the criteria for [a concentrated animal feeding operation] and is capable of holding 1,000 or more animal units or the manure produced by 1,000 or more animal units." Minn. R. 7020.0405, subd. 1(B)(1).[1] But "agricultural land on which livestock have been allowed to pasture at any time during the ten-year period beginning January 1, 2010, is permanently exempt from" this requirement "for so long as the property remains in pasture." Minn.Stat. § 116.07, subd. 7d(a) (2012). The statute defines "pasture" as:

> areas where livestock graze on grass or other growing plants. Pasture also means agricultural land where livestock are allowed to forage during the winter time and which land is used for cropping purposes in the growing season. In either case, the concentration of animals must be such that a vegetative cover, whether of grass, growing plants, or crops, is maintained during the growing season except in the immediate vicinity of temporary supplemental feeding or watering devices.

*Id.*, subd. 7d(b) (2012).[2]

The parties dispute whether the concentration of cattle on Reichmann's winter feeding fields is commensurate with the statutory definition of "pasture." This issue presents a question of statutory interpretation, subject to de novo review. *See Halvorson v. Cnty. of Anoka,* 780 N.W.2d 385, 389 (Minn.App.2010). When interpreting a statute, we must "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012). In doing so, we first determine whether the statute's language, on its face, is ambiguous. *Am. Tower, L.P. v. City of Grant,* 636 N.W.2d 309, 312 (Minn.2001). A statute's language is ambiguous only when it "is subject to more than one reasonable interpretation." *Amaral v. Saint Cloud Hosp.,* 598 N.W.2d 379, 384 (Minn.1999). We construe words and phrases according to their plain and ordinary meanings. *Frank's Nursery Sales, Inc. v. City of Roseville,* 295 N.W.2d 604, 608 (Minn.1980); *see also* Minn.Stat. § 645.08(1) (2012) (providing that words are construed according to their common usage). When the legislature's intent is clearly discernible from a statute's plain and unambiguous language, we interpret the language according to its plain meaning without resorting to other principles of statutory construction. *State v. Anderson,* 683 N.W.2d 818, 821 (Minn.2004).

The commissioner concluded that Reichmann's winter feeding fields are not pas-

---

1. For the first time on appeal, Reichmann argues that the commissioner erred by ordering Reichmann to obtain a *combined* NPDES/SDS permit. Reichmann waived this issue by not raising it below. *See North Am. Water Office v. LTV Steel Mining Co.,* 481 N.W.2d 401, 405 (Minn.App.1992) (on appeal from an administrative agency decision, this court will not consider issues that were not raised before the agency). Moreover, because we conclude that Reichmann is not required to obtain an NPDES permit, *see infra* section II, this argument is moot.

2. The legislature crafted this independent definition of "pasture" in 2011, having previously deferred to the MPCA's definition. *Compare* Minn.Stat. § 116.07, subd. 7d (2010) *with* Minn.Stat. § 116.07, subd. 7d(b) (Supp. 2011). The MPCA's definition does not explicitly include winter foraging. Minn. R. 7020.0300, subd. 18 (defining "pasture" as "areas where grass or other growing plants are used for grazing and where the concentration of animals is such that a vegetation cover is maintained during the growing season except in the immediate vicinity of temporary supplemental feeding or watering devices").

tures because (1) a vegetative cover of crops is not "maintained during the growing season," and (2) the cattle are not "allowed to forage."

**Vegetative cover**

The commissioner found that because *certain* crop varieties emerge before the *particular* varieties Reichmann plants on its winter feeding fields, Reichmann "establishes a vegetative cover for only a portion of the growing season." However, this is contrary to the plain meaning of the statute, which unambiguously provides that "crops" may satisfy the vegetative cover requirement. *See* Minn.Stat. § 116.17, subd. 7d(b). Where, as here, agricultural land maintains a crop for the duration of the variety's normal growing season, the "vegetative cover" element of the "pasture" definition is satisfied. Therefore, the commissioner's first basis for concluding that Reichmann's winter feeding fields are not pasture is based on an erroneous interpretation of the statute.

**Allowed to forage**

The commissioner found that after the cattle "are on the fields for a few weeks, the incidental vegetation is downed and soiled and not truly available as 'forage.'" Therefore, the commissioner concluded, the cattle on the winter feeding fields are not "allowed to forage" within the meaning of the statutory exemption. On appeal, Reichmann argues only that the evidence supporting this finding and conclusion is not credible. Because we defer to the agency's credibility determinations, *Saif Food Market v. Comm'r, Dept. of Health*, 664 N.W.2d 428, 431 (Minn.App. 2003), Reichmann's argument is unavailing. Because Reichmann's cattle are not "allowed to forage," Reichmann's winter feeding fields do not qualify for the statutory pasture exemption. Accordingly, the winter feeding fields require an SDS permit.

**II.**

We review a decision de novo when the "decision turns on the meaning of words in an agency's own regulation," or in a federal regulation which the agency is charged with "enforcing and administering." *In re Cities of Annandale and Maple Lake NPDES/SDS Permit Issuance*, 731 N.W.2d 502, 513, 515–16 (Minn.2007). "[W]hen the language of the regulation is clear and capable of understanding, we give no deference to the agency's interpretation and we may substitute our own judgment for that of the agency." *Id.* at 515. However, "when the relevant language of the regulation is unclear and susceptible to different reasonable interpretations, i.e. ambiguous, we will give deference to the agency's interpretation and will generally uphold that interpretation if it is reasonable." *Id.*

Under federal law, an animal feeding operation (AFO) is a lot or facility where (1) animals "have been, are, or will be stabled or confined and fed or maintained for a total of 45 days or more in any 12–month period" and (2) "[c]rops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility." 40 C.F.R. § 122.23(b)(1) (2012). Certain AFOs, including AFOs that stable or confine at least 1,000 cattle, are concentrated animal feeding operations (CAFOs). 40 C.F.R. § 122.23(b)(2), (4)(iii) (2012). A CAFO "must not discharge unless the discharge is authorized by an NPDES permit." 40 C.F.R. § 122.23(d)(1) (2012).

Reichmann challenges the commissioner's conclusion that its winter feeding fields are an AFO. The commissioner concluded that the fields are an AFO because (1) "during the time the animals are pres-

ent, a vegetative cover of crop residue is not sustained," and (2) "crops or crop residue is not 'sustained' in the 'normal growing season,' but only for a part of the growing season after a crop is planted and it grows."

### During the time the animals are present

■■ The language of the regulation establishes that the relevant timeframe is "the normal growing season." *See* 40 C.F.R. § 122.23(b)(1)(ii). In a preamble to the regulation, the Environmental Protection Agency (EPA) purports to clarify the regulation by stating that "in the case of a winter feedlot, the 'no vegetation' criterion in the AFO definition is meant to be evaluated during the winter, when the animals are confined." 68 Fed.Reg. 7176, 7189 (Feb. 12, 2003). But we will only consult the preamble "when, unlike here, the regulation's plain language is ambiguous." *Albemarle Corp. v. Herman*, 221 F.3d 782, 786 (5th Cir.2000); *see also Advanta USA, Inc. v. Chao*, 350 F.3d 726, 728–29 (8th Cir.2003) (consulting preamble to interpret ambiguous term); *Weiss v. Fujisawa Pharmaceutical Co.*, 464 F.Supp.2d 666, 673 (E.D.Ky.2006) (a preamble is "entitled only to limited deference because it is not subject to notice and comment procedures"). Here, the commissioner explicitly found that "Reichmann removes all of the cattle from the winter-time feeding sites prior to the normal planting season." Therefore, "the time the animals are present" is irrelevant to the determination of whether Reichmann's fields are an AFO. Accordingly, we conclude that the commissioner's first basis for deeming the fields an AFO is grounded in an erroneous interpretation of the regulation.

### Normal growing season

■ The language of the regulation unambiguously provides that a lot that sustains crops in the normal growing season is not an AFO. *See* 40 C.F.R. § 122.23(b)(1)(ii). Because the commissioner explicitly found that Reichmann "tills the soil and plants crops on the winter-time feeding sites at the same time as other crop fields in the area" and Reichmann's crops "are sustained throughout the summer growing season," the commissioner's conclusion that Reichmann only sustains crops "for a part of the growing season" relies on an unreasonable interpretation of the phrase "normal growing season." We conclude that a crop's "normal growing season" does not begin before the crop typically begins to grow in the region. Accordingly, we conclude that the commissioner's second basis for deeming Reichmann's winter feeding fields an AFO is grounded in an erroneous interpretation of the regulation.

Under the plain meaning of the regulation, because Reichmann's winter feeding fields sustain crops in the normal growing season, they are not an AFO. *See* 40 C.F.R. § 122.23(b)(1). Because the winter feeding fields are not an AFO, they are not a CAFO and do not require an NPDES permit. *See* 40 C.F.R. § 122.23(b)(2), (d)(1).[3]

The dissent finds the language of subdivision (2) to be "unclear or reasonably susceptible to more than one reasonable interpretation". We disagree. While we agree that the language of the regulation could be written better to accomplish the purposes of the Clean Water Act, we find the language of the regulation to provide a clear and unambiguous threshold for defin-

---

**3.** Because we conclude that Reichmann's winter feeding fields are not a CAFO, and therefore do not require an NPDES permit, we decline to address either Reichmann's contention that it is not currently discharging pollutants or whether the MPCA can require an NPDES permit for a CAFO that *has* discharged but is *no longer* discharging.

ing an AFO. The Reichmann "winter feeding" operation does not meet this threshold and therefore a NPDES permit is not required under the regulation. *See id.*

## III.

Finally, Reichmann argues that because its prefiled testimony "may not have been available to [the] ALJ," the commissioner's decision was made upon unlawful procedure and violates the constitutional right to due process, and that these errors may have prejudiced Reichmann's substantial rights. But the commissioner specifically found that the ALJ "had the Reichmann pre-filed testimony before him during the hearing and when he prepared the ALJ report." In support of this finding, the record establishes that the prefiled testimony was (1) reviewed by the ALJ before the contested case hearing, (2) discussed during the contested case hearing, (3) referenced in writing by the parties after the contested case hearing, and (4) referenced in the ALJ report. Because the commissioner's finding is supported by substantial evidence, Reichmann is not entitled to relief. *See Reserve Min. Co. v. Herbst,* 256 N.W.2d 808, 827 (Minn. 1977). Moreover, because the commissioner was keenly aware of the issue and made a final decision based on the complete record, Reichmann has failed to establish the requisite prejudice.

## DECISION

Because Reichmann's winter feeding fields are not a pasture—because its cattle are not "allowed to forage"—the commissioner did not err by ordering Reichmann to obtain a state SDS permit. But because Reichmann's winter feeding fields are not a CAFO, the commissioner erred

by ordering it to obtain a federal NPDES permit.

**Affirmed in part and reversed in part.**

CHUTICH, Judge (affirming in part, dissenting in part).

I agree with the majority opinion that, under state law, Reichmann Land and Cattle, LLP (Reichmann) must obtain a State Disposal System permit and that Reichmann received due process of law in the proceedings before the administrative-law judge. I disagree with the majority concerning the federal permit, however, because I believe that the federal regulation governing a Concentrated Animal Feeding Operation is ambiguous and that the agency's interpretation must therefore be given substantial deference. Under the correct deferential approach, Reichmann's winter cattle-feeding operation is a Concentrated Animal Feeding Operation that is required to obtain a National Pollutant Discharge Elimination System permit before it may discharge manure into Minnesota waters. I respectfully dissent from the portion of the court's opinion that concludes that federal oversight is not required.

In reviewing the relevant federal regulation, we give no deference to the agency's interpretation when "the language of the regulation is clear and capable of understanding." *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance,* 731 N.W.2d 502, 514–15 (Minn.2007) (quotation omitted). But when the relevant language is "unclear or susceptible to different reasonable interpretations, i.e., ambiguous, we will give deference to the agency's interpretation and will generally uphold that interpretation if it is reasonable." *Id.* at 515.

The determination of whether words or phrases are unclear or reasonably susceptible to more than one reasonable interpretation, however, "does not depend on a

reading of those words or phrases in isolation, but relies on the meaning assigned to the words or phrases in accordance with the apparent purpose of the regulation as a whole." *Id.* at 517. Thus, our supreme court has said that "the meaning of statutory language, plain or not, depends on context." *Id.* at 518 (quotation omitted). Accordingly, this regulation must be interpreted "within the context of the [Clean Water Act]," a law that "vests in the [Environmental Protection Agency] and the States broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution." *Id.* at 518, 520.

Here, the parties agree that Reichmann exceeds the size criterion of 1,000 head of cattle that is one of the key components of a Concentrated Animal Feeding Operation. *See* 40 C.F.R. § 122.23 (2013). And no dispute exists as to whether the animals spend at least 45 days on the land in winter. *See id.,* at b(1). The critical dispute is whether this phrase of the regulation governing an Animal Feeding Operation is met: "[c]rops, vegetation, forage growth, or post-harvest residues are not sustained in the normal growing season over any portion of the lot or facility." *Id.,* at b(1)(ii).

Interpreting this phrase in the context of the Clean Water Act, I believe that subdivision (ii) of 40 C.F.R. § 122.23 b(1) is unclear and susceptible to different reasonable interpretations about whether it applies to winter feeding operations. Reichmann's proposed reading asserts that "sustained" means "maintained" and because the record shows that he maintains "crops ... in the normal growing season" on the lot in question, the winter feeding operation is not an Animal Feeding Operation. While this interpretation is not unreasonable under a plain reading of those precise words, it does not consider other terms in the regulation and it eviscerates federal protection of the environment during the winter months. Under this proposed reading, a farm operation could feed thousands of cattle for many months in the winter without any federal oversight of discharges as long as the farmer planted a crop in the spring. Given that the purpose of the regulation is to define when a certain number of animals confined for a certain number of days creates environmental problems significant enough to require regulation, total exclusion of the winter months from the Clean Water Act defies explanation.

While we may not disregard the letter of the law "under the pretext of pursuing the spirit," *Annandale,* 731 N.W.2d at 516, the plain language of the regulation is unclear when one analyzes all the regulation's terms. The commissioner's interpretation of "sustained" to mean "to keep up, to carry or to withstand (a weight or pressure)," is also a plausible reading of the regulation, and is one that preserves the protections of federal law whenever the requisite numbers of cattle are feeding on a confined lot for the required numbers of months. By including the word "sustained," the Environmental Protection Agency intended that the vegetation be examined when there is a force acting on it—a thousand head or more of cattle—to see whether a vegetative cover exists that will protect the waters of the state.

In addition, despite the language "in the normal growing season," the inclusion of other terms further makes the timeframe of the regulation unclear. For example, "forage growth" supports the commissioner's assertion that the relevant examination of the vegetative cover on the land takes place when the animals are present. The term "post-harvest residue," in conjunction with "normal growing season,"

adds to the uncertainty about the pertinent timeframe.

Because the regulation is susceptible to different reasonable interpretations, and, at a minimum, the definition proposed by the Minnesota Pollution Control Agency is not clearly erroneous, we appropriately defer to the Environmental Protection Agency's promulgated preamble to the rule at issue. *See Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 911, 137 L.Ed.2d 79 (1997) (holding that deference to an agency's interpretation of its own regulation is controlling unless "plainly erroneous or inconsistent with the regulation" (quotation omitted)); *Univ. Med. Ctr., Inc. v. Sebelius,* 856 F.Supp.2d 66, 83 (D.D.C.2012) (holding that when preamble confirms interpretation of regulation, "substantial deference" is required). The contemporaneously published preamble states that the regulation specifically applies to wintering operations.

The agency's interpretation provides that, "in the case of a winter feedlot, the 'no vegetation' criterion in the [Animal Feeding Operation] definition is meant to be evaluated during the winter, when the animals are confined." 68 Fed.Reg. 7176, 7189 (Feb. 12, 2003). The Environmental Protection Agency further noted that it "assumes that [Animal Feeding Operations] and permitting authorities will use common sense and sound judgment in applying this definition." *Id.*

This interpretation is consistent with the language of the rule and it furthers the purposes and principles of the Clean Water Act. Accordingly, given the deference owed to an agency interpreting its own regulation,[4] I conclude that Reichmann's winter feeding practice is an Animal Feed-

ing Operation. *See* 40 C.F.R. § 122.23(b)(1). Because the winter feeding fields meet that definition, Reichmann is running a Concentrated Animal Feeding Operation that requires a federal NPDES permit before it may discharge waste into Minnesota waters. *See* 40 C.F.R. § 122.23(b)(2), (d)(1). For these reasons, I would affirm the decision of the commissioner in all respects.

---

4. The Minnesota Pollution Control Agency is charged by state and federal law with the day-to-day responsibility for enforcing and administering this portion of the Clean Water Act in Minnesota. The regulation at issue is properly characterized as the pollution control agency's own regulation. *See Annandale,* 731 N.W.2d at 516.