In the Matter of the CITIES OF ANNANDALE AND MAPLE LAKE NPDES/SDS PERMIT ISSUANCE FOR THE DISCHARGE OF TREATED WASTEWATER, and Request for Contested Case Hearing.

No. A04–2033.

Supreme Court of Minnesota.

May 17, 2007.

## OPINION

ANDERSON, PAUL H., Justice.

This appeal results from the issuance of a National Pollutant Discharge Elimination System (NPDES) permit by the Minnesota Pollution Control Agency (MPCA) for a wastewater treatment plant jointly proposed by the City of Annandale and the City of Maple Lake (the Cities). The MPCA found that the proposed plant—when operating at capacity—would increase phosphorus discharge to the North Fork of the Crow River by approximately 2,200 pounds per year over that which is discharged by the Cities' existing facilities, but the MPCA concluded that, under 40 C.F.R. § 122.4(i) (2006), this increase would not contribute to the violation of water quality standards in the Lake Pepin watershed. The MPCA reached this conclusion and issued a permit on the basis that the increased discharge would be offset by an approximate 53,500–pound annual reduction in phosphorus discharge due to an upgrade of a wastewater treatment plant in nearby Litchfield.

A divided Minnesota Court of Appeals reversed the MPCA, concluding that the phosphorus discharge from the proposed facility would violate water quality standards, and therefore issuing a permit violated 40 C.F.R. § 122.4(i). The Cities and the MPCA petitioned for review of the following issues: (1) whether a state agency's interpretation of a federal regulation that the agency is charged with enforcing and administering is entitled to deference by the courts; and (2) whether the MPCA may consider offsets from another source in determining whether a discharge causes or contributes to the violation of water quality standards under 40 C.F.R. § 122.4(i). We reverse.

The cities of Annandale and Maple Lake (the Cities) are located in Wright County, Minnesota, approximately 125 miles northwest of Lake Pepin. Annandale and Maple Lake experienced population increases of 27 percent and 44 percent respectively between 1980 and 2000. Wright County as a whole is projecting a 54 percent population increase between 2000 and 2030.

Maple Lake currently utilizes a mechanical plant for its wastewater treatment, which plant is nearing capacity. The plant discharges approximately 1,400 pounds of phosphorus annually into Mud Lake, which flows into the North Fork of the Crow River (North Fork), then into the Mississippi River, and ultimately into Lake Pepin. Lake Pepin is a naturally-occurring lake on the Mississippi River and has been identified by the Minnesota Pollution Control Agency (MPCA)[1] as impaired under the Clean Water Act. See 33 U.S.C. §§ 1251–1387 (2000). For its wastewater treatment, Annandale utilizes a pond system with spray irrigation; this system does not discharge into the North Fork or any other surface water. The existing Annandale facility is operating at capacity. The Cities' current wastewater treatment facilities are both over 40 years old. Annandale's last National Pollutant Dis-

---

1. The MPCA, which has a commissioner and a nine-member Citizens' Board with the commissioner serving as chair of the board, administers the laws relating to preservation of the environment and protection of the public health consistent with the economic welfare of the state. Minn.Stat. ch. 116 (2006).

charge Elimination System (NPDES) permit expired on March 31, 2004. Maple Lake's last NPDES permit expired on August 31, 2005.

In late 2002, the Cities jointly developed plans for a new wastewater treatment plant. In 2003, the Cities applied to the MPCA for an NPDES permit for a single joint plant that would discharge into an unnamed tributary of the North Fork. Based on a condition imposed by the Wright County Planning Commission, which required discharge directly into the North Fork rather than the unnamed tributary, the Cities submitted an amendment to their permit application in March 2004.

The MPCA placed a draft proposed permit "on public notice" on May 10, 2004, and held a public hearing on May 27, 2004. The draft permit placed specific limits on the proposed plant's discharge, including a maximum concentration level of 1 mg/L for phosphorus and a minimum level of 6 mg/L for dissolved oxygen, as well as limits on carbonaceous biochemical oxygen demand, ammonia nitrogen, mercury, fecal coliform, pH, and suspended solids. With these limits in place, the proposed plant would discharge 3,600 pounds of phosphorus annually when it reached capacity by the year 2024. The MPCA received comments from respondent Minnesota Center for Environmental Advocacy (MCEA) and others, and responded in writing to the comments. On September 28, 2004, the MPCA held a meeting at which MPCA staff members, MCEA representatives, and members of the public discussed the draft proposed permit and the MPCA's proposed findings of fact, conclusions of law, and order.

One focus of the discussion at the MPCA meeting was the MCEA's concern that issuance of the NPDES permit would violate 40 C.F.R. § 122.4(i), which provides in part that a state may not issue an NPDES permit "[t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute to the violation of water quality standards." The MCEA asserted that the proposed plant's increase of phosphorus discharge would necessarily cause or contribute to the violation of water quality standards in Lake Pepin. The MCEA also expressed concern that the discharge from the proposed plant would negatively affect dissolved oxygen levels in the North Fork in violation of water quality standards.[2]

The MPCA recommended approval of the draft NPDES permit and issued findings, including a finding that, when operated at capacity, the proposed plant would increase phosphorus discharge to the North Fork by approximately 2,200 pounds annually over that which is discharged by Maple Lake's existing plant. But the MPCA found that this increase in phosphorus discharge would be offset by an approximate 53,500–pound reduction in phosphorus discharge to the North Fork due to upgrades to the Litchfield wastewater treatment plant. Accordingly, the MPCA concluded that "[b]ecause of the net reduction in the watershed, the proposed joint Annandale/Maple Lake facility will not contribute to water quality standards violations in Lake Pepin."

Additionally, the MPCA concluded that the dissolved oxygen effect from the proposed plant would not contribute to the

---

**2.** There was also a discussion of whether a contested case hearing was required. The MPCA concluded that a contested case hearing was not required because the first and third standards for granting a contested case hearing under Minn. R. 7000.1900, subp. 1 (2005), had not been satisfied. This conclusion by the MPCA has not been challenged on appeal.

violation of water quality standards in the North Fork. The MPCA reached this conclusion because the section of the North Fork that is impaired for dissolved oxygen is 17.9 miles downstream from the discharge point of the proposed plant and the impairment to dissolved oxygen in a shallow river is greatest one to three miles downstream from a discharge point. On September 30, 2004, the MPCA issued the NPDES permit to the Cities.

By writ of certiorari to the court of appeals, the MCEA challenged the MPCA's decision to issue the NPDES permit. The MCEA argued to the court of appeals that (1) no deference should be given to the MPCA's interpretation of 40 C.F.R. § 122.4(i); (2) 40 C.F.R. § 122.4(i) prohibits the issuance of a NPDES permit before a total maximum daily load (TMDL)[3] is established; (3) the MPCA's conclusion that the proposed plant would not contribute to violation of water quality standards in Lake Pepin was erroneous; and (4) the MPCA's finding that increased carbonaceous biochemical oxygen demand and phosphorus from the proposed plant would not contribute to the North Fork's dissolved oxygen impairment is not supported by substantial evidence.

A divided court of appeals reversed in a published opinion. *In re Cities of Annandale & Maple Lake NPDES/SDS Permit Issuance (Cities of Annandale & Maple Lake)*, 702 N.W.2d 768, 770 (Minn.App. 2005). The court concluded that no defer-ence is given to a state agency's interpretation of a federal regulation because the interpretation of a federal regulation is a question of law that is reviewed de novo. *Id.* at 771. The court then rejected the MCEA's argument that 40 C.F.R. § 122.4(i) precludes issuance of an NPDES permit before a TMDL is completed, concluding that the absence of a TMDL does not necessarily prevent the issuance of a permit even though a TMDL has not been established.[4] 702 N.W.2d at 773. The court further concluded that the MPCA "was not barred as a matter of law from issuing a permit because of the impact of the Cities' proposed plant on dissolved-oxygen levels in the North Fork." *Id.* at 773–74. But the court of appeals held that "[b]ecause the discharge from the Cities' proposed plant would contribute to the impairment of Section 303(d) waters," the MPCA "erred by issuing a permit in violation of 40 C.F.R. § 122.4(i)." 702 N.W.2d at 776. In reaching its holding, the court apparently used "the impairment of Section 303(d) waters" interchangeably with "violation of water quality standards." It also appears that the court concluded that the proposed 2,200–pound increase in phosphorus discharge over what is currently discharged by the Maple Lake plant would necessarily "contribute to the impairment of" impaired waters, regardless of significant reductions in phosphorus discharge elsewhere in the wa-

3. A total maximum daily load (TMDL) is the sum of pollutants a body of water can absorb from all point and nonpoint sources, plus a margin of safety, and still meet water quality standards for its designated uses. Claudia Copeland, Congressional Research Serv. Report for Congress, *Clean Water Act and TMDLs* (Sept. 11, 1997), *available at* http://wwwncsonline.org/nle/crsreports/water/h20–24.cfm (last visited Apr. 27, 2007). "According to the EPA [Environmental Protection Agency], a TMDL provides a holistic view of a watershed measuring the effect of each pollution source on the entire system. It also provides a framework for identifying specific actions needed to reach water quality standards." *Id.*

4. The MCEA did not initially seek review of this issue nor did it conditionally seek review of the issue in its response to the Cities' and MPCA's petitions for review.

tershed.[5]

The court of appeals' dissent concluded that "when reviewed with the deference properly accorded agency actions on review by this court, the [M]PCA's interpretation of the regulation and its decision to grant the permit were reasonable and consistent with the purposes and principles of the [Clean Water Act]." 702 N.W.2d at 776 (Schumacher, J., dissenting). The dissent concluded that "judicial deference, rooted in the separation of powers doctrine, is extended to an agency decision-maker in the interpretation of statutes that the agency is charged with administering and enforcing." *Id.* at 777 (citations omitted). The dissent further concluded that a "reasonableness" standard should be applied by a court reviewing the MPCA's decision to issue an NPDES permit, and that the MPCA's decision was reasonable and should have been affirmed. *Id.* at 777–79.

None of the parties sought review of the dissolved oxygen issue; but, in the context of the phosphorous discharge, the Cities and the MPCA sought review of the court of appeals' rulings on (1) whether a state agency's interpretation of a federal regulation that the agency is charged with enforcing and administering is entitled to deference by the courts, and (2) whether the MPCA may consider offsets from other sources in determining whether a new discharge causes or contributes to the violation of water quality standards under 40 C.F.R. § 122.4(i). Additionally, the Metropolitan Council, Trout Unlimited, Minnesota Lakes Association, Environmental Law and Policy Center of the Midwest, Natural Resources Defense Council, Midwest Environmental Advocates, American Rivers, Clean Up the River Environment, Coalition for a Clean Minnesota River,

New Ulm Area Sportsfishermen, Friends of the Minnesota Valley, Builders Association of the Twin Cities, Coalition of Greater Minnesota Cities, Minnesota Environmental Science & Economic Review Board, National Association of Clean Water Agencies, League of Minnesota Cities, and Wright County Mayors Association requested leave to participate as amici curiae. We granted both petitions for review and all 17 amicus requests.

## I.

◼ Before specifically addressing the two issues raised by the parties, a general overview of the Clean Water Act (CWA) as applicable to the facts of this case is helpful. The CWA is the cornerstone of surface water protection in the United States. Its purpose "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2000).

> It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.

33 U.S.C. § 1251(b) (2000).

◼ The CWA provides for two types of water quality measures: "effluent limitations" and "water quality standards." *Arkansas v. Oklahoma,* 503 U.S. 91, 101, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992). Effluent limitations promulgated by the Environmental Protection Agency (EPA) "restrict the quantities, rates, and concen-

---

**5.** The court of appeals also stated that "the [M]PCA concedes that this phosphorus will affect the Lake Pepin watershed." *Cities of* *Annandale & Maple Lake,* 702 N.W.2d at 774. It is not clear from the record whether the MPCA made such a concession.

trations of specified substances which are discharged from point sources." *Id.* Under state and federal law, the MPCA is the Minnesota state agency charged with enforcing and administering the CWA and its attendant regulations. Minn.Stat. § 115.03, subds. 1, 5 (2006); 40 C.F.R. § 123.25(a) (2006). The regulation subject to interpretation by the MPCA in this case is 40 C.F.R. 122.4(i), which is a regulation promulgated by the EPA under the CWA.

Water quality standards, which are promulgated by the states, generally establish the desired condition of a body of water. The CWA requires states to establish water quality standards sufficient to "protect the public health or welfare, enhance the quality of water and serve the purposes of this chapter." 33 U.S.C. § 1313(c)(2)(A) (2000). A state's water quality standards must be established "taking into consideration [each body of water's] use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." *Id.* Water quality standards are "aimed at translating the broad goals of the CWA into waterbody-specific objectives." U.S. Envtl. Prot. Agency, *Introduction to the Clean Water Act,* http://www.epa.gov/watertrain/cwa/cwa2. htm (last visited Apr. 27, 2007).

None of the parties in this case specifically identifies the relevant water quality standards, but it appears that if a body of water is identified as impaired under section 303(d) of the CWA, it is necessarily in violation of one or more of the relevant water quality standards. *See* 33 U.S.C. § 1313(d)(1)(A) (codifying CWA § 303(d) and stating: "Each State shall identify [as impaired] those waters within its boundaries for which the effluent limitations * * * are not stringent enough to implement any water quality standard applicable to such waters."). In 2002 the MPCA listed Lake Pepin as impaired under section 303(d) because of excessive phosphorus levels.[6] Minn. Pollution Control Agency, MPCA 2002 303(d) List (Jan. 22, 2003), *available at* http://www.pca.state.mn.us/ publications/reports/tmdl–2002list.pdf. Additionally, the MPCA has recently identified one section of the North Fork as impaired because of insufficient dissolved oxygen levels. Minn. Pollution Control Agency, 2006 Final TMDL List, *available at* http://www.pca.state.mn.us/publications/ wq–iw1–03.xls (last visited Apr. 27, 2007) Accordingly, it appears that the MPCA has determined that Lake Pepin is presently in violation of water quality standards for phosphorus and one section of the North Fork is presently in violation of water quality standards for dissolved oxygen.

In addition to requiring states to identify impaired waters, section 303(d) of the CWA also mandates that states establish a TMDL for each pollutant that causes a body of water to fail to meet water quality standards. 33 U.S.C. § 1313(d)(1)(C) (2000). As previously noted, a TMDL is the sum of pollutants a body of water can absorb from all point and nonpoint sources, plus a margin of safety, and still meet water quality standards for its designated uses. The MPCA has not estab-

---

**6.** Phosphorus is an essential nutrient for the plants and animals that make up the aquatic food web. U.S. Envtl. Prot. Agency, *Monitoring and Assessing Water Quality, 5.6 Phosphorus,* http://www.epa.gov/owow/monitoring/ volunteer/stream/vms56.html (last visited Apr.

27, 2007). But excess phosphorus contributes to the degradation of water quality because it feeds algae blooms and affects water clarity, oxygen levels, and aquatic vegetation. *Id.*

lished TMDLs for Lake Pepin or the North Fork. The MPCA estimates that the TMDLs will not be established before late 2008 for Lake Pepin and 2012 for the North Fork.

If a TMDL has been established for a body of water identified as impaired under section 303(d), an NPDES permit may not be issued unless the permitting authority finds that the new source or discharge will not cause or contribute to the violation of water quality standards and will not violate the TMDL. *See* 40 C.F.R. § 122.4(i). MCEA argues that a plain reading of 40 C.F.R. § 122.4(i) indicates that the MPCA may not issue any NPDES permits before a TMDL is established. The court of appeals rejected this argument, concluding that:

> When a TMDL has not been established, a new source is not required to demonstrate compliance with the TMDL. Rather, the opening sentence of 40 C.F.R. § 122.4(i) provides that a permit may be issued provided that the new source does not "cause or contribute to the violation of water quality standards." The remainder of section 122.4(i) addresses the criteria for issuing a permit when a TMDL has been established.

*Cities of Annandale & Maple Lake,* 702 N.W.2d at 773. No party sought review of the court's ruling that an NPDES permit may be issued before establishment of a TMDL, and we conclude that it is neither necessary nor prudent for us to address this issue at this time.

With the foregoing general background on the CWA, we now address the first issue raised by the parties—whether a state agency's interpretation of a federal regulation that the agency is charged with enforcing and administering is entitled to deference by the courts. The MCEA ar-

gues that no deference should be given to the MPCA's decision on how to interpret 40 C.F.R. § 122.4(i). The MCEA also asserts that the MPCA's issuance of the NPDES permit was "affected by error of law," *see* Minn.Stat. § 14.69(d) (2006),[7] because the permit was issued "contrary to the plain language of federal regulation" and, therefore, this appeal presents a question of law that is to be reviewed de novo.

The court of appeals' majority apparently agreed with the MCEA's argument that the MPCA's decision to grant the permit was affected by an error of law, and did not give deference to the MPCA's interpretation of 40 C.F.R. 122.4(i). *See Cities of Annandale & Maple Lake,* 702 N.W.2d at 772. More particularly, the court of appeals noted that "[t]he decision of an agency is presumed to be correct, and we ordinarily accord deference to an agency in its field of expertise." *Id.* at 771 (citing *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977)). But the court went on to conclude that "[b]ecause the interpretation of a federal regulation is a question of law, we need not defer to a state agency's interpretation." *Id.* In essence, the court held that because the MPCA was interpreting a federal regulation—not a regulation promulgated by the MPCA—the MPCA's interpretation is not entitled to deference by the courts. We disagree with this result because the court of appeals has too narrowly construed the deference courts are to give to a state agency's interpretation of a regulation that the agency is charged with enforcing and administering.

While we have been asked on several occasions to determine whether and how much deference courts should give to administrative agency interpretations of reg-

---

7.  *See infra* note 8.

ulations, we have not yet addressed the precise question presented here—whether courts should defer to a state agency's interpretation of a federal regulation when the state agency is charged with enforcing and administering the federal regulation. Nevertheless, in some of our earlier cases, we have articulated certain criteria for how we are to determine whether to grant deference to a state agency's interpretation of its own regulation. More particularly, 12 years after deciding *Reserve Mining,* we rendered a decision in *St. Otto's Home v. Minnesota Department of Human Services* that provides us with guidance for deciding the issue before us. 437 N.W.2d 35 (Minn.1989).

*St. Otto's Home* addressed a state agency's interpretation of a regulation promulgated by that agency. 437 N.W.2d at 40. We stated in *St. Otto's Home* that we give considerable deference to a state agency's construction of its "own regulation." *Id.* But, unlike the case before us, in *St. Otto's Home* we were not required to decide whether an agency's "own regulation" is limited to regulations promulgated by that agency or also includes regulations coming from another source that the agency is legally required to enforce and administer. Yet, a United States Supreme Court case cited in *St. Otto's Home* provides us with a reference point on this issue. *Id.* (citing *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). In *Udall,* the Supreme Court reasoned that deference to an agency's interpretation of a statute is appropriate, particularly "when the administrative practice at stake 'involves a contemporaneous construction of a statute by the [people] charged with the responsibility of setting its machinery in motion; of making the parts work efficiently and smoothly while they are yet untried and new.' " 380 U.S. at 16, 85 S.Ct. 792 (quot-

ing *Power Reactor Dev. Co. v. Int'l Union of Elec., Radio & Mach. Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961)). We agree with the Supreme Court's reasoning in *Udall* and conclude that an agency's "own regulation" may include a regulation that the agency is legally required to enforce and administer, even if the regulation was not promulgated by the agency.

This broader definition of an agency's "own regulation" is supported by our recent decision in *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn. (BCBSM),* 624 N.W.2d 264 (Minn.2001), in which we gave deference to the Minnesota Department of Commerce's determination that Blue Cross and Blue Shield's proposal to bring its excess surplus into compliance with the law did not satisfy the requirements of Minn.Stat. § 62C.09 (2000). 624 N.W.2d at 283–84. We concluded in *BCBSM* that

> [t]he agency decision-maker is presumed to have the expertise necessary to decide technical matters within the scope of the agency's authority, and judicial deference, rooted in the separation of powers doctrine, is extended to an agency decision-maker in the interpretation of statutes *that the agency is charged with administering and enforcing.*

*Id.* at 278 (emphasis added) (citation and footnote omitted). Not only is our decision in *BCBSM* consistent with the Supreme Court's holding in *Udall,* our conclusion in *BCBSM* goes beyond *Udall* because we state that when judicial deference—which is rooted in the separation of powers doctrine—is appropriate, it goes beyond deference to agency-created regulations and also includes statutes administered by the agency that the agency is charged with enforcing and administering.

Based on the foregoing case law, we conclude that when addressing whether to

defer to an agency's interpretation of a federal regulation, an initial factor courts must consider is whether the agency is charged with enforcing and administering the regulation such that the regulation can be characterized as the agency's own regulation. Further, we conclude that when a state agency is charged with the day-to-day responsibility for enforcing and administering a federal regulation, courts should give deference to the agency's interpretation of that regulation when giving such deference meets the other criteria we have established for determining when it is appropriate for courts to defer to an agency's interpretation of its own regulation.

## II.

■■■ Having concluded that we treat a federal regulation as a state agency's own regulation if the state agency is legally charged with the day-to-day enforcement and administration of the regulation, we now proceed to determine our standard for reviewing an agency's interpretation of its own regulation. In particular, we must identify what factors we should consider when determining whether courts should give deference to the agency's interpretation. We stated in *Reserve Mining Co.* that "decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to

the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." 256 N.W.2d at 824. We concluded that the rationale for deference to administrative agency decisions is rooted in the separation of powers doctrine and the agency's training and expertise in the subject matter. *See id.* The legislature codified some aspects of this deferential review of agency decisions arising out of contested case proceedings in the Minnesota Administrative Procedures Act (MAPA).[8] *See Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency (MCEA v. MPCA),* 644 N.W.2d 457, 463 (Minn.2002). Thus, while it is evident that under certain circumstances we have a policy of deferring to an agency's interpretation, it is not clear what criteria and limits guide this policy. Therefore, it will be helpful to review when and why we have given deference in the past.

■■■ We have previously indicated that we will not defer to an agency's interpretation of its own regulation when the regulation's language is clear and capable of understanding. *Resident v. Noot,* 305 N.W.2d 311, 312 (Minn.1981). This approach comports with the approach articulated by the Supreme Court. *Chevron U.S.A. Inc. v. Natural Res. Def. Council,*

---

**8.** In *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency,* we expanded the application of the MAPA beyond decisions arising out of contested case proceedings and held that the MAPA also applies to "an area such as environmental review, uniquely involving application of an agency's expertise, technical training, and experience" even if the decision was not the result of a contested case proceeding. 644 N.W.2d, 457, 463–64 (Minn. 2002). This case falls within the area of environmental review, and therefore application of the MAPA standards is appropriate. *See* Minn.Stat. ch. 14 (2006). The MAPA provides that a court may reverse or modify an agency's decision

if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:
(a) in violation of constitutional provisions; or
(b) in excess of the statutory authority or jurisdiction of the agency; or
(c) made upon unlawful procedure; or
(d) *affected by other error of law;* or
(e) unsupported by substantial evidence in view of the entire record as submitted; or
(f) arbitrary or capricious.
Minn.Stat. ch. 14.69 (2006) (emphasis added).

*Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."); *see also United States v. LaBonte,* 520 U.S. 751, 762 n. 6, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) (concluding that a statute was unambiguous and therefore concluding that there was no need to decide whether an agency's interpretation was owed deference). But we have indicated we will defer to the agency's interpretation when the language is ambiguous and when the agency's interpretation is one of long standing. *In re Estate of Abbott,* 213 Minn. 289, 295, 6 N.W.2d 466, 469 (1942). In *St. Otto's Home,* we said we will give "considerable deference" "when the relevant language is unclear or susceptible to different interpretations." 437 N.W.2d at 40.

■ It also appears that if we conclude that the language of a regulation is unclear or susceptible to different interpretations, another factor influences whether we defer to an agency's interpretation. We have said that we defer to an agency's interpretation of its own regulations when the language of the regulation is subject to a construction that is so technical in nature that only a specialized agency has the experience and expertise needed to understand the regulation. *See BCBSM,* 624 N.W.2d at 278; *Reserve Mining Co.,* 256 N.W.2d at 824. Soon after *BCBSM,* we reached a similar result in *MCEA v. MPCA,* in which we concluded that the MPCA's interpretation and application of a state statute was entitled to deference on the basis that the interpretation of the statute required an application of the agency's training and expertise. 644 N.W.2d at 464. Specifically, we concluded that

the statute requires an EIS if Boise Cascade's project will result in "significant environmental effects." A determination whether significant environmental effects result from this project is primarily factual and necessarily requires application of the agency's technical knowledge and expertise to the facts presented. Accordingly, it is appropriate to defer to the agency's interpretation of whether the statutory standard is met.

*Id.* (citation omitted). In *MCEA v. MPCA,* we did not expressly conclude that the phrase "significant environmental effects" was ambiguous, but we concluded that the MPCA's training and expertise were necessary to interpret and *apply* the statute. *See id.* Our language in *MCEA v. MPCA* echoes in part the language we used in *Reserve Mining Co.* where we said that "decisions of administrative agencies enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." 256 N.W.2d at 824.

In 1989, we attempted to summarize our approach to interpreting an agency's regulation in *St. Otto's Home,* where we said:

When a decision turns on the meaning of words in a statute or regulation, a legal question is presented. In considering such questions of law, reviewing courts are not bound by the decision of the agency and need not defer to agency expertise. When the agency's construction of *its own regulation* is at issue, however, considerable deference is given to the agency interpretation, especially when the relevant language is unclear or susceptible to different interpretations. If a regulation is ambiguous, agency interpretation will generally be upheld if it is reasonable. No deference is given to

the agency interpretation if the language of the regulation is clear and capable of understanding; therefore, the court may substitute its own judgment.

437 N.W.2d at 39–40 (citations omitted). Several key conclusions appear to emerge from our decisions in *St. Otto's Home* and other relevant cases. First, when a decision turns on the meaning of words in an agency's own regulation, it is a question of law that we review de novo. Second, when the language of the regulation is clear and capable of understanding, we give no deference to the agency's interpretation and we may substitute our own judgment for that of the agency. Third, when the relevant language of the regulation is unclear or susceptible to different reasonable interpretations, i.e., ambiguous, we will give deference to the agency's interpretation and will generally uphold that interpretation if it is reasonable.

What is not immediately apparent from our holding in *St. Otto's Home* and from our other decisions is when and why we are to consider an agency's expertise and special knowledge when determining whether to give deference to the agency's interpretation. As noted above, we have on several occasions stated that we will defer to an agency when that agency has expertise and special knowledge in its field of technical training, education, and expertise. *See MCEA v. MPCA*, 644 N.W.2d at 464; *BCBSM*, 624 N.W.2d at 278; *Reserve Mining Co.*, 256 N.W.2d at 824. It is only after we read our prior case law closely that a pattern emerges for when and why we would consider an agency's expertise and special knowledge in the context of the case before us. Based on this case law, we have deferred to an agency's expertise and

special knowledge when (1) the agency is interpreting a regulation that is unclear and susceptible to more than one interpretation; and (2) the agency's interpretation is reasonable.[9] Therefore, we conclude that when determining whether to defer to an agency, we will consider that agency's expertise and special knowledge.

In asserting its position that no deference should be given to the MPCA's interpretation of 40 C.F.R. § 122.4(i), the MCEA relies on *In re Denial of Eller Media Company's Applications for Outdoor Advertising Device Permits (Eller Media)*, 664 N.W.2d 1, 7 (Minn.2003), where we noted that we have "the authority to review de novo errors of law which arise when an agency decision is based upon the meaning of words in a statute." In *Eller Media*, we did not explicitly discuss any of the factors discussed above; but on review of *Eller Media*, it becomes apparent that consideration of these factors is implicit in our analysis and decision. In that case, it appears that we first addressed whether the Minnesota Department of Transportation (MnDOT), the state agency at issue, was charged with enforcing and administering the law under review—Minnesota's Outdoor Advertising Act. 664 N.W.2d at 7 (discussing Minn. Stat. ch. 173 (2002)). It also appears from our analysis that MnDOT was charged with administering this act. *Id.* (citing Minn.Stat. § 173.185 (2002)). But we apparently found no indication that the Outdoor Advertising Act was ambiguous or that MnDOT's training and expertise were required for its interpretation and application. *Eller Media*, 664 N.W.2d. at 6–7. Thus, under the factors established by our

9. Our case law also indicates that we will consider the agency's expertise and special knowledge when reviewing an agency's application of a regulation when application of the regulation is "primarily factual and necessarily requires application of the agency's technical knowledge and expertise to the facts presented." *MCEA v. MPCA*, 644 N.W.2d at 464. But this is not the situation that confronts us in this case.

prior case law in *Reserve Mining Co., St. Otto's Home, BCBSM,* and *MCEA v. MPCA,* we were not required to defer to MnDOT's interpretation of the Outdoor Advertising Act.[10] Accordingly, our decision not to defer to the agency's interpretation in *Eller Media* did not overrule or modify the analytical framework we previously established for determining when we defer to an agency's interpretation of its own regulation.

In summary, we glean from our case law that review of an agency's interpretation of its own regulations is a question of law that courts review de novo. When answering this question, there are several factors courts need to consider when determining whether to give deference to an agency's interpretation. These factors include whether the agency is legally required to enforce and administer the regulation under review and whether the meaning of the words in the regulation is clear and unambiguous or is unclear and susceptible to different reasonable interpretations—ambiguous. If a court concludes the meaning of the words in the regulation is clear and unambiguous, it need not defer to the agency's interpretation and may substitute its own judgment for that of the agency. If a court concludes that the meaning of the words in an agency's regulation is unclear and susceptible to different reasonable interpretations, the court must then determine whether the agency's interpretation is reasonable. When determining whether an agency's interpretation is reasonable, courts may consider the agency's expertise and special knowledge, especially when the construction of the regulation's language is so technical in nature that the agency's field of technical training, education, and experience is necessary to understand the regulation. When a court concludes that the language of the agency's regulation is unclear and susceptible to different reasonable interpretations and that the agency's interpretation of the regulation is reasonable, then the court will generally defer to the agency's interpretation.

## III.

The next step in our analysis is to consider the foregoing factors in the context of the case before us. The first factor we address is whether the MPCA is legally required to enforce and administer 40 C.F.R. § 122.4(i). As noted above, the MPCA is charged by state and federal law with the day-to-day responsibility for enforcing and administering 40 C.F.R. § 122.4(i) in Minnesota. This point is undisputed by the parties. Therefore, we conclude that 40 C.F.R. § 122.4(i) is properly characterized as and qualifies as the MPCA's own regulation. *See* Minn.Stat. § 115.03, subds. 1, 5; 40 C.F.R. § 123.25(a); Minn. R. 7050.0210, subp. 6(c) (2005).

## IV.

Next, we must determine whether 40 C.F.R. § 122.4(i) is unclear and susceptible to different reasonable interpretations. When interpreting a statute or regulation, we first look to see whether the statute or regulation is clear or ambiguous on its face. *See Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (interpreting a statute). If the words of the regulation are clear and free from ambiguity, "the letter of the law [regulation] shall not be disregarded under the pretext of pursuing the spirit." *See* Minn.Stat. § 645.16 (2006). As noted ear-

---

10. We note that despite declining to defer to MnDOT's interpretation of "business area," we nevertheless upheld MnDOT's interpreta-

tion and reversed the court of appeals. *Eller Media,* 664 N.W.2d at 10.

lier, a regulation is ambiguous if it is unclear or reasonably susceptible to more than one reasonable interpretation. *See St. Otto's Home*, 437 N.W.2d at 40. But the fact that a word has more than one meaning does not necessarily mean it is ambiguous. *Board of Regents v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 892 (Minn.1994). We have said that the meaning of a word depends on how it is being used. *Id.* Importantly, our determination of whether words or phrases are ambiguous does not depend on a reading of those words or phrases in isolation, but relies on the meaning assigned to the words or phrases in accordance with the apparent purpose of the regulation as a whole. *See Metro Office Parks Co. v. Control Data Corp.*, 295 Minn. 348, 352, 205 N.W.2d 121, 124 (1973) (interpreting a contract provision). *See also Chiodo v. Bd. of Educ.*, 298 Minn. 380, 382, 215 N.W.2d 806, 808 (1974) ("[W]ords of a statute are to be viewed in their setting, not isolated from their context.").

To determine if 40 C.F.R. § 122.4(i) is ambiguous in the context of the CWA, we must begin with the language of the regulation itself. 40 C.F.R. § 122.4(i) provides that "[n]o permit may be issued"

> [t]o a new source or a new discharger, if the discharge from its construction or operation will *cause or contribute to the violation of water quality standards.* The owner or operator of a new source or new discharger proposing to discharge into a water segment which does not meet applicable water quality standards or is not expected to meet those standards even after the application of the effluent limitations required by sections 301(b)(1)(A) and 301(b)(1)(B) of

CWA, and for which the State or interstate agency has performed a pollutants load allocation for the pollutant to be discharged, must demonstrate, before the close of the public comment period, that:

> (1) There are sufficient remaining pollutant load allocations to allow for the discharge; and

> (2) The existing dischargers into that segment are subject to compliance schedules designed to bring the segment into compliance with applicable water quality standards.

(Emphasis added.) It is the phrase "cause or contribute to the violation of water quality standards" that is the source of most of the disagreement about the interpretation of 40 C.F.R. § 122.4(i).[11] In essence, the regulation precludes the issuance of a permit to a new discharge if issuance of the permit will "cause or contribute" to a water quality impairment. Unfortunately, the regulation does not define, elaborate on, or further explain the general term "cause or contribute." The MPCA maintains that because this part of the regulation is couched in these general terms, the duty falls to it, the regulating agency, to determine precisely what will fulfill the regulatory requirements the MPCA is charged with implementing under the CWA.

The MPCA concluded that "[t]he proposed increase in phosphorus load * * * is significantly less than the reduction in phosphorus load in the watershed from the upgrade of the Litchfield wastewater treatment facility. Because of the net reduction in the watershed, the proposed * * * facility will *not contribute* to water quality standards violations in Lake Pe-

---

**11.** The parties and amici also disagree whether an NPDES permit may be issued before a TMDL has been completed. As previously noted, the court of appeals held that 40 C.F.R. § 122.4(i) does not bar issuance of an NPDES permit before a TMDL has been completed, but no party sought review of this issue. Accordingly, we do not consider it.

pin." (Emphasis added.) The court of appeals reversed, concluding that "[a] plain reading of the phrase 'cause or contribute to the violation of water quality standards' indicates that, so long as some level of discharge may be causally attributed to the impairment of [impaired] waters, a permit shall not be issued." *Cities of Annandale & Maple Lake,* 702 N.W.2d at 775. The court further concluded that

> the record demonstrates that, notwithstanding the reduction in phosphorus resulting from other sources, the waters at issue remain impaired. And the amount of phosphorus discharged into the North Fork from the proposed wastewater-treatment plant, which is more than double the current phosphorus level of 1,400 pounds per year, will contribute to impaired nutrient levels in Lake Pepin.

*Id.* The dissent in essence agrees with the court of appeals' plain reading analysis that places a very narrow interpretation on 40 C.F.R. § 122.4(i) and thus would affirm the court of appeals.

It appears that the difference between the MPCA's interpretation of the regulation and the court of appeals' interpretation centers on whether *any* discharge to an "impaired water" necessarily "causes or contributes to a violation of water quality standards" or, alternatively, if net improvements to an "impaired water" can be considered in determining whether a new source or discharger "causes or contributes" to the violation of water quality standards. Specifically, the MPCA and the court of appeals ascribe different meanings to "cause or contribute" and "water quality standards" as used in the context of the CWA and as applied to the facts of this case.

The court of appeals' majority did not find any ambiguity in the regulation's language and held that under a "plain reading of the phrase 'cause or contribute to the

violation of water quality standards,' " an NPDES permit may not be issued "so long as some level of discharge may be causally attributed to the impairment of Section 303(d) waters." *Cities of Annandale & Maple Lake,* 702 N.W.2d at 775. Because phosphorus "does not break down into smaller components," the court of appeals essentially concluded that any increase in phosphorus discharge from the proposed plant will affect the Lake Pepin watershed. *Id.* at 774.

In essence, the court of appeals' majority viewed the phrase "cause or contribute to the violation of water quality standards" in black-and-white terms. But both the Supreme Court and our court have said that "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991); *see also State v. Donaldson,* 41 Minn. 74, 80, 42 N.W. 781, 782 (1889) (noting that even when "the words are plain," ambiguity "may be created by the context"). Therefore, we must view the words of the regulation "in their setting, not isolated from their context." *Chiodo v. Bd. of Educ.,* 298 Minn. at 382, 215 N.W.2d at 808. *See also Metro Office Parks Co.,* 295 Minn. at 352, 205 N.W.2d at 124. Here, the regulation must be interpreted within the context of the language of the CWA. Such an approach is consistent with the approach taken by other courts, which have "favored a 'whole act' approach to the Clean Water Act." 3B Norman J. Singer, *Statutes and Statutory Construction* § 77:4 (6th ed.2003).

The MPCA found that the proposed plant, when operating at capacity, would increase phosphorus discharge into the North Fork by approximately 2,200 pounds annually over that which is currently discharged by the Maple Lake plant. But the MPCA found that this

increase in phosphorus discharge would be offset by an approximate 53,500–pound reduction in phosphorus discharge into the North Fork due to the upgrade of a wastewater treatment plant in nearby Litchfield. Based on this offset, the MPCA concluded that the proposed plant would not contribute to water quality standards violations in the Lake Pepin watershed and therefore granted the permit.

The court of appeals' majority in reversing the MPCA concluded that there is no "indication that a discretionary system of offsets is authorized" under 40 C.F.R. § 122.4(i). 702 N.W.2d at 774–75. Nevertheless, the court of appeals concluded that its decision to reverse the MPCA did not represent a complete ban on discharge [12] that would reach waters already in violation of existing water quality standards, which type of ban was proscribed by the holding of the United States Supreme Court in *Arkansas v. Oklahoma*. 702 N.W.2d at 775–76 (citing 503 U.S. at 108, 112 S.Ct. 1046). But on appeal the MPCA contends that the court of appeals' interpretation is contrary to the Supreme Court's holding in *Arkansas* and will effectively mean that no new permits can be issued to wastewater treatment plants where the phosphorous discharge will flow into impaired waters, at least not before TMDLs are established.[13]

Given the Supreme Court's holding in *Arkansas*, we conclude that the court of appeals' narrow reading of the regulation in essence imposes a complete ban on new facilities like the one proposed here and that such an interpretation is unreasonable. In *Arkansas*, the owners of a new wastewater treatment plant in the state of Arkansas applied for a permit to discharge up to 6.1 million gallons of effluent per day into an unnamed stream. 503 U.S. at 95, 112 S.Ct. 1046. The stream ultimately flowed into the Illinois River in Oklahoma. *Id.* Oklahoma asserted the discharge into a tributary of the Illinois River would violate its water quality standards which provide that no degradation of water quality shall be allowed in the upper Illinois River. *Id.* An administrative law judge "found that there would be no detectable violation of [Oklahoma's water quality standards]" from the proposed plant and approved the permit. *Id.* at 97, 112 S.Ct. 1046. On appeal, the Tenth Circuit Court of Appeals reversed the issuance of the permit, holding that "the Clean Water Act prohibits granting an NPDES permit * * * where applicable water quality standards have already been violated." *State of Okla. v.*

12.  While the court of appeals stated that its decision did not amount to a complete or categorical ban of discharge, amici League of Minnesota Cities and Wright County Mayors Association note that, following the court's decision, "[a]t least 15 of the League's member cities have already been notified by the MPCA that they will not be eligible for new facility permits as a result of the court of appeals' decision."

13.  We have held that a statute (or regulation) is ambiguous if it is susceptible to more than one reasonable interpretation. *See Weinberger v. Maplewood Review*, 668 N.W.2d 667, 672 (Minn.2003). Therefore, the differing interpretations by the MPCA and the court of appeals might, standing alone, support an argument that reasonable minds may differ on the plain and ordinary meaning of "cause or contribute to a violation of water quality standards" and therefore the phrase is ambiguous. But such disagreement is not our standard for determining ambiguity. In the context of interpreting contract language, we have said, "the mere fact that a court has disagreed on the interpretation of contract language is not determinative that the contract language is ambiguous." *Bank Midwest, Minnesota, Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn.2004) (citing *Republic Nat'l Life Ins. Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979)).

*Envtl. Prot. Agency,* 908 F.2d 595, 616 (10th Cir.1990).

The Supreme Court granted certiorari and reversed, concluding that the Tenth Circuit "construed the Clean Water Act to prohibit any discharge of effluent that would reach waters already in violation of existing water quality standards. We find nothing in the Act to support this reading." *Arkansas,* 503 U.S. at 107, 112 S.Ct. 1046 (footnote omitted). "Thus, rather than establishing the categorical ban announced by the [Tenth Circuit]—which might frustrate the construction of new plants that would improve existing conditions—the Clean Water Act vests in the EPA and the States broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution." 503 U.S. at 108, 112 S.Ct. 1046. The dissent also notes and refers to the latter clause from *Arkansas;* but it is also important to note that the language that precedes this clause, which language explicitly rejected the Tenth Circuit's narrow interpretation of the CWA, rejected a categorical ban that might frustrate the construction of new plants that would improve existing conditions.

The Supreme Court in *Arkansas* did not address the use of offsets in determining whether a new discharge would cause or contribute to the violation of water quality standards, but the Environmental Appeals Board (EAB), which is the final EPA decisionmaker on administrative appeals under the CWA, has applied the principles underlying *Arkansas* to a situation similar to the case before us. *Carlota Copper Co.,* 11 Envtl. Admin. Decisions 692 (Sept. 30, 2004) (order denying review). In *Carlota Copper Co.,* several environmental groups challenged the issuance of an NPDES permit to the Carlota Copper Company for a new open-pit copper mine project that would discharge effluent into an impaired

body of water. *Id.* at 702–06. The permit required Carlota to partially remediate, as an offset against Carlota's proposed new copper discharge, another of its copper mines, which was located upstream from the proposed mine. *Id.* at 705. In its order denying review of the permit, the EAB stated:

> There is nothing in * * * 40 C.F.R. section 122.4(i) providing that an impaired water segment needs to be restored prior to allowing new source discharges into the water body. The Board declines to endorse Petitioners' interpretation because to do so would perpetrate the very outcome the Supreme Court in *Arkansas v. Oklahoma* sought to avoid (*adoption of a rigid approach that might frustrate the construction of new facilities that would improve existing conditions*). The Board finds no clear error in the Region's determination that Carlota's discharges will not "cause or contribute" to a violation of water quality standards, but rather, Carlota will improve existing conditions because the reductions that will result from its activities are greater than the projected discharges. In addition, the Region did not clearly err in determining that "there are sufficient remaining pollutant load allocations to allow for Carlota's discharges."

11 Envtl. Admin. Decisions at 695 (syllabus) (emphasis added) (citation omitted).

The MCEA argues that *Carlota* is distinguishable because (1) the permit in *Carlota* was issued post-TMDL; and (2) the offset was required to be made by the same discharger that was applying for the new permit. Although it is correct that the Carlota permit was issued after a TMDL had been established for the impaired body of water, the first sentence of 40 C.F.R. § 122.4(i) applies regardless of whether a TMDL has been completed.

*See Carlota*, 11 Envtl. Admin. Decisions at 706; 40 C.F.R. § 122.4(i). Even when a TMDL has been established, a permitting authority must still determine that the new discharge will not cause or contribute to the violation of water quality standards. Therefore, the fact that the Carlota permit was issued post-TMDL does not mean that the EAB's reasoning is not helpful and important when we analyze the issuance of a pre-TMDL permit.

Moreover, while MCEA argues that *Carlota* is distinguishable because it dealt with an offset made by the same discharger, the propriety of considering offsets from another discharger when determining whether a new source or discharge causes or contributes to the violation of water quality standards is supported by the EPA's interpretation of 40 C.F.R. § 122.4(i). The interpretation is documented in an EPA memorandum in *Sierra Club v. Clifford*, No. Civ.A. 96–0527, 1999 WL 33494861 (E.D.La.1999). In its memorandum in *Clifford*, the EPA stated:

> To date, EPA has not formally interpreted 40 C.F.R. § 122.4(i) with respect to what conditions, if present, would allow for permit issuance to new sources or new dischargers proposing to discharge their effluent into impaired waters. * * * In practice, permitting has occurred in at least three situations that EPA believes are consistent with current regulations.

Defendants' Response Memorandum in Support of Schedule for Preparation of Total Maximum Daily Loads at 52, *Clifford*, 1999 WL 33494861. The EPA went on to identify three situations in which, by EPA practice, an NPDES permit may be issued to a new source or new discharger proposing to discharge effluent into impaired waters before completion of a TMDL. *Id.* at 52–53. The third situation identified by the EPA is

where it is demonstrated that other pollutant source reductions (such as nonpoint source reductions implemented by the discharger) will offset the discharge in a manner consistent with [water quality standards]. The ultimate result of this type of "offset" or "trade" may be a net decrease in the loadings of the pollutant of concern in the CWA § 303(d) listed water, and therefore, EPA, by practice, has considered a discharge which has been offset in accordance with permit requirements not to "cause or contribute to a violation of water quality standards."

*Id.* at 53.

The court of appeals' majority concluded that the EPA's brief in *Clifford* could not be relied upon as documentation of the EPA's interpretation of 40 C.F.R. § 122.4(i) because the brief was drafted in the course of litigation and "the EPA's brief does not reference any preexisting ruling or practice with respect to 40 C.F.R. § 122.4(i)." *Cities of Annandale & Maple Lake*, 702 N.W.2d at 774 n. 4. The Supreme Court has concluded that a federal agency's interpretation of a law expressed in the course of litigation is not entitled to deference if it is "wholly unsupported by regulations, rulings, or administrative practice." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). But contrary to the court of appeals' assertion, the EPA's brief in *Clifford* expressly identifies the EPA's existing "administrative practice" that reflects its interpretation of 40 C.F.R. § 122.4(i). Thus, we conclude that *Bowen* does not preclude the MPCA from relying on the EPA's brief in *Clifford* in its interpretation of 40 C.F.R. 122.4(i). Moreover, the position advanced by the EPA is compelling evidence that 40 C.F.R. 122.4(i) is susceptible to different reasonable interpretations.

Finally, we note that the MPCA's interpretation of 40 C.F.R. 122.4(i) also finds support in the policy considerations behind the EPA's Final Water Quality Trading Policy, which was promulgated on January 13, 2003. This policy supports "pre-TMDL trading in impaired waters to achieve progress towards or the attainment of water quality standards." Envtl. Prot. Agency, Water Quality Trading Policy, 68 Fed.Reg. 1610 (Jan. 13, 2003), *available at* http://www.epa.gov/owow/watershed/trading/finalpolicy2003.html. The EPA, in addressing the grounds for its water quality trading policy and why it believes this policy provides greater flexibility and has the potential to achieve greater water quality and environmental benefits, stated:

> Finding solutions to these complex water quality problems requires innovative approaches that are aligned with core water programs. Water quality trading is an approach that offers greater efficiency in achieving water quality goals on a watershed basis. It allows one source to meet its regulatory obligations by using pollutant reductions created by another source that has lower pollution control costs. Trading capitalizes on economies of scale and the control cost differentials among and between sources.

68 Fed.Reg. at 1609. While we are not dealing with a market-based program in the case before us, we conclude that much of the EPA's rationale on trading applies to the MPCA's consideration of offsets in enforcing and administering water quality regulations with respect to these two state subdivisions—the Cities.

The foregoing analysis demonstrates that the interpretation of 40 C.F.R. 122.4(i) is not a clear-cut issue where we can just give effect to an unambiguously expressed intent and therefore substitute our judgment for that of the MPCA. Rather, our analysis reveals the differing interpretations that have been applied to this regulation. Therefore, we conclude that 40 C.F.R. 122.4(i) is unclear and susceptible to different reasonable interpretations. Accordingly, we must next proceed to determine if the MPCA's interpretation is reasonable and to what extent we are to consider the MPCA's expertise and special knowledge when making this determination.

V.

■■■ We next address whether, under 40 C.F.R. § 122.4(i), it is reasonable for the MPCA to consider offsets from another source within the watershed in determining whether a new discharge source causes or contributes to the violation of water quality standards. As an initial matter, we note that the focus of our inquiry is whether the MPCA's interpretation of 40 C.F.R. § 122.4(i) is reasonable under the circumstances of *this case*—that is, a case involving pollution offsets that are both contemporaneous and located in the same watershed. Further, the determination of whether the proposed joint wastewater treatment plant will "cause or contribute to the violation of water quality standards" requires some factual inquiry. Here, we note that the interpretation of "cause or contribute to the violation of water quality standards" is not unlike the question of whether "significant environmental effects" will result from a project, which we held in *MCEA v. MPCA* "necessarily requires application of the agency's technical knowledge and expertise to the facts presented." 644 N.W.2d at 464. Therefore, we will also address whether our interpretation of 40 C.F.R. § 122.4(i) requires the MPCA's training and expertise for its interpretation and application.

The MPCA's strategy for addressing phosphorus in NPDES permitting demonstrates that the question of whether a particular source is contributing to the violation of water quality standards is not as simple as determining whether there is any net increase in phosphorus discharge from a particular source. The MPCA uses "basin/watershed management approaches as the main policy context for addressing phosphorus." *See* Minn. Pollution Control Agency, *Strategy for Addressing Phosphorus in National Pollutant Discharge Elimination System (NPDES) Permitting* (March 2000), *available at* http://www. pca.state.mn.us/water/pubs/phos-npdes-strategy.pdf (noting that because "[i]nformation and knowledge about nutrient management issues are changing rapidly," the strategy should be viewed as "transitional"). Under this strategy, the MPCA establishes an ambient water quality goal for the watershed for phosphorus. Minn. Pollution Control Agency, *MPCA Phosphorus (P) Stragegy: NPDES Permits* at 2 (March 2000), http://www.pca.state.mn.us/ water/pubs/phos-npdes.pdf (hereinafter *NPDES Permits*). This goal can be numeric (such as a percentage reduction) or narrative (such as "no net increase"), depending on the specific site and water resource.

The MPCA considers a number of variables in assessing how a particular discharge of phosphorus "affects" the watershed. *See NPDES Permits* at 2. The MPCA's assessment model "includes using standard lake/reservoir eutrophication models, data assessment, scientific research, and other information relating to the lake/reservoir and its tributaries, watershed, and cumulative point and non-point source phosphorus loads." *Id.* Using this assessment model, the MPCA determines whether "the individual contribution of the discharge" causes any adverse changes in terms of actual or predicted increases in chlorophyll-*a* concentration, increased frequency of nuisance algae blooms, reduced transparency, reduced dissolved oxygen concentrations, or related adverse responses to phosphorus. *Id.* This determination is typically made over a range in flow conditions after MPCA scientists review data and apply their "best professional judgment." *Id.* Further, the MPCA has adopted the concept of "de minimus phosphorus loadings"—municipal facilities with a phosphorus load of 1,800 pounds per year or less. *Id.* at 3. In the MPCA's experience, these "small discharges" generally do not have "a measurable impact on the environment." *Id.*

In making its determination, the MPCA must also deal with difficult policy issues related to accommodating population growth in a state with significant surface waters, many of which are considered impaired. *See NPDES Permits* at 4. As previously noted, these are issues on which the CWA does not provide clear guidance. Because the MPCA's application of 40 C.F.R. § 122.4(i) requires a careful balancing of competing policies and interests across the state, the agency must necessarily draw on its expertise and special knowledge. *See Arkansas*, 503 U.S. at 106, 112 S.Ct. 1046 (stating that in the CWA, Congress struck a careful balance among competing policies and interests). Here, we believe that any necessary policy determinations in interpreting the regulation are more properly left to the MPCA, the agency responsible for interpreting its regulation. *Cf. Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1002–03, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005) (supporting deference to administrative agencies, particularly where the questions "involve a 'subject matter [that] is technical, complex, and dynamic,' " as well as difficult policy judgments *quoting Nat'l Cable & Telecomms. Ass'n, Inc. v.*

*Gulf Power Co.,* 534 U.S. 327, 339, 122 S.Ct. 782, 151 L.Ed.2d 794 (2002)). Therefore, for all the foregoing reasons, we conclude that the MPCA's technical expertise and training is necessary to interpret and apply 40 C.F.R. § 122.4(i).

Based on the foregoing, we conclude that when viewed in its setting and not isolated from its context, the broad nature of the phrase "cause or contribute to the violation of water quality standards" leaves leeway for the MPCA to make a range of policy judgments based on the MPCA's scientific and technical knowledge. *Cf. Natural Res. Def. Council v. Costle,* 568 F.2d 1369, 1382 (D.C.Cir.1977) ("conced[ing] necessary flexibility in the shaping of [NPDES] permits that is not inconsistent with the clear terms" of the CWA). Nothing in the language of the regulation or the structure of the CWA prohibits the MPCA from considering offsets in this situation. In light of the multitude of variables and possible approaches in determining whether a specific discharge of phosphorus will "cause or contribute to the violation of water quality standards"—not the least of which is whether the MPCA should consider the discharge in isolation or in the context of other reductions in the watershed as a whole—it appears that the MPCA's interpretation of 40 C.F.R. § 122.4(i) is reasonable.

Our analysis also shows that the MPCA's interpretation of 40 C.F.R. § 122.4(i) as allowing offsets in determining whether a new source will cause or contribute to the violation of water quality standards is supported by the reasoning of the Supreme Court in *Arkansas,* the EAB's decision in *Carlota,* the EPA's memorandum in *Clifford,* and the rationale behind the EPA's water quality trading policy. Moreover, we conclude that, when dealing with a situation like the one presented in this case—two aging wastewater treatment facilities with expired NPDES permits, which are at or near capacity in a region of the state that is experiencing significant growth—it was not unreasonable for the MPCA to allow a 2,200–pound per year (at capacity) increase in phosphorus discharge from a new wastewater treatment facility to be offset by a contemporaneous 53,500–pound per year decrease in a nearby facility that is located in the same watershed. Given the flexibility and broad authority delegated to states to develop "long-range, area-wide programs" for water quality and the lack of any express prohibition on offsets, we will not, under these circumstances, second-guess the reasonableness of the MPCA's decision that the Cities' new joint wastewater treatment facility will not "contribute to the violation of water quality standards." *See Arkansas,* 503 U.S. at 108, 114, 112 S.Ct. 1046 (stating that "[i]t is not our role, or that of the Court of Appeals, to decide which policy choice is the better one").

Accordingly, we conclude that the MPCA's interpretation of 40 C.F.R. § 122.4(i) as allowing offsets from another source in determining whether a new source will cause or contribute to the violation of water quality standards is reasonable and is consistent with the purposes and principles of the CWA.

VI.

In summary, we conclude that the MPCA is legally required to enforce and administer 40 C.F.R. § 122.4(i) as its own regulation, that 40 C.F.R. § 122.4(i) is ambiguous, and that consideration of the MPCA's training and expertise is necessary when we make a determination of whether the MPCA's interpretation of 40 C.F.R. § 122.4(i) to allow offsets from another source in determining whether a new source will cause or contribute to the viola-

tion of water quality standards is reasonable. *Cf. Arkansas*, 503 U.S. at 110, 112 S.Ct. 1046 (recognizing that the system of federally-approved state standards as applied in the interstate context constitutes federal law and the EPA's interpretation of the state's standard is entitled to deference). Further, we conclude that when we give the appropriate deference to the MPCA's interpretation of 40 C.F.R. § 122.4(i), we must uphold the MPCA's interpretation of the regulation because we have concluded that the agency's interpretation is reasonable and consistent with the purposes and principles of the CWA. *See St. Otto's Home*, 437 N.W.2d at 40.[14] We also conclude that, at best, the narrow interpretation of 40 C.F.R. 122.4(i) adopted by the court of appeals' majority and the dissent demonstrates that the interpretation of the regulation's language is unclear and that it is—and has been—susceptible to different interpretations. At worst, such an interpretation is wrong and will perpetuate the very outcome the Supreme Court sought to avoid with its decision in *Arkansas v. Oklahoma*—namely, the adoption of such a rigid approach that construction of new facilities that would improve existing conditions would be thwarted.

Finally, a few additional observations on the dissent are in order. At the core of our difference of opinion with the dissent is the dissent's conclusion that 40 C.F.R. § 122.4(i) unambiguously articulates an absolute prohibition that denies the MPCA the ability to issue a permit to the Cities for their proposed joint wastewater treatment facility. While we reach the opposite conclusion—that the regulation is ambiguous—and as a result consider the dissent's adoption of MCEA's absolute prohibition argument to be too narrow an interpreta-

tion and too restrictive, we nevertheless have acknowledged that 40 C.F.R. § 122.4(i) is potentially susceptible to different interpretations. What we find problematic is the dissent's comment that "no rationale for deference is present in this case." This is not so. What we have done is to first apply the "own regulation" factor to determine if a deference analysis is appropriate. Then, after having answered the "own regulation" question in the affirmative, we have proceeded to thoroughly implement our standard deference analysis, which includes such factors as ambiguity, expertise, and reasonableness.

With respect to our standard deference analysis, we are in apparent agreement with the dissent that we should decide whether to accord deference on a case-by-case basis. And that is precisely what we have done here. Specifically, we have concluded that deference is warranted only after thoroughly considering multiple factors, not the single factor to which the dissent would reduce our analysis. Judicial deference to an agency's interpretation of its own regulation is rooted in the separation of powers doctrine. In the spirit of this doctrine, we acknowledge that an agency's training and expertise are helpful and frequently necessary to properly interpret and apply a regulation that is unclear and susceptible to more than one reasonable interpretation. Further, we disagree with the dissent's conclusion that, based on this opinion, the MPCA can use discharge reductions from the "distant past" or "unknown future" or "geographically distant locales" to "largely circumvent" its mandate. Given our conclusion that, under our standard deference analysis, reasonableness is necessarily determined using a case-by-case inquiry, our opinion does not

---

**14.** We note that the deferential approach we take with respect to the MPCA is similar to that taken by the Supreme Court in *Arkansas*

where the Court gave deference to the EPA's interpretation of a similar standard. 503 U.S. at 112, 112 S.Ct. 1046.

authorize, much less invite, the MPCA to interpret 40 C.F.R. § 122.4(i) to allow discharge permits in cases involving offsets that are remote in either time or place.

For all the foregoing reasons, we hold that the court of appeals erred when it reversed the MPCA's decision to issue the NPDES permit for the Cities' proposed wastewater treatment plant.

Reversed.

ANDERSON, Russell A., C.J., took no part in the consideration or decision of this matter.

PAGE, Justice (dissenting).

## I.

I respectfully dissent. While I agree that under some circumstances deference to a state agency's interpretation of a federal regulation may be appropriate, deference is not appropriate in this case. Judicial deference to an agency's interpretation of a regulation is inappropriate if the language of the regulation is unambiguous, as an agency is not permitted to contravene the plain meaning of the language used in the regulation. *See St. Otto's Home v. Minn. Dep't of Human Servs.*, 437 N.W.2d 35, 40 (Minn.1989). While context may help us ascertain its plain meaning, *see King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991), an examination of the actual language that comprises the text is *always* necessary to reach conclusions about meaning. In this case, the court concludes that 40 C.F.R. § 122.4(i) (2006) is ambiguous without any analysis of the regulation's actual language and without explanation as to what in the language is unclear. Instead, the court lists various interpretations of 40 C.F.R.

§ 122.4(i) that have been offered in the course of other litigation. The fact that multiple interpretations have been suggested does not establish ambiguity, *see Bank Midwest, Minnesota, Iowa, N.A. v. Lipetzky*, 674 N.W.2d 176, 179 (Minn. 2004), yet the court concludes that the regulation is ambiguous simply because of "differing interpretations that have been applied to this regulation." Analyzing 40 C.F.R. § 122.4(i)'s actual language, I conclude that deference to the MPCA's interpretation of 40 C.F.R. § 122.4(i) is not warranted because the regulation is not ambiguous.

## II.

Under 40 C.F.R. § 122.4(i), the Minnesota Pollution Control Agency (MPCA) may not issue a National Pollutant Discharge Elimination System (NPDES) permit "[t]o a new source or a new discharger, if the discharge from its construction or operation will cause or contribute[1] to the violation of water quality standards." 40 C.F.R. § 122.4(i) (footnote added). The language of the regulation is clear. No permit may be issued to a new source or discharger if it will cause a violation of water quality standards, e.g., if the addition of phosphorus discharged from the source seeking the permit would elevate phosphorus levels in a body of water above the level that constitutes a violation. Nor may a permit be issued to a new source or discharger if it will contribute to a violation of water quality standards, e.g., if the new source would discharge phosphorus into a body of water previously determined to have phosphorus levels in excess of permissible levels. In determining whether a discharge will cause or contribute to a

---

**1.** "To cause" means "[t]o bring about" or "[to produce] an effect, result, or consequence." *American Heritage Dictionary* 305 (3rd ed.1996). "Contribute" means "[t]o give or supply in common with others" and "[t]o help bring about a result [or to] act as a factor." *Id.* at 410.

violation, the MPCA may take into consideration pollution from sources other than the source seeking a permit, but *only* so far as is necessary to determine whether a violation exists before or will exist after issuance of the permit.

It is undisputed that phosphorus levels in the Lake Pepin Watershed currently exceed water quality standards and, as determined by the MPCA, are in violation of those standards. Minn. Pollution Control Agency, *MPCA 2002 303(d) List* (Jan. 22, 2003), *available at* http://www.pca.state.mn.us/publications/reports/tmdl–2002list.pdf. The MPCA has also determined that the proposed Maple Lake/Annandale facility will increase the cities' discharge of phosphorus into that watershed from approximately 1,400 pounds of phosphorus annually to about 3,600 pounds annually. Thus, while the proposed facility will not cause a violation of the standards, it is clear that an increase of 2,200 pounds of phosphorus per year will "help bring about," that is, contribute to, a water quality standards violation in the Lake Pepin Watershed. It is also clear that the violation will occur irrespective of any action taken by the City of Litchfield to reduce the amount of phosphorus it discharges into the watershed. By granting the NPDES permit to the cities of Maple Lake and Annandale, the MPCA ignores the unambiguous language of 40 C.F.R. § 122.4(i). Therefore, the MPCA's issuance of the NPDES permit should be reversed.

### III.

Even if the plain meaning of the regulation's language is ignored and it is assumed that the regulation is ambiguous, I would still conclude that deference is inappropriate because none of the traditional rationales for deferring to an agency's interpretation of a regulation are present in this case.

Under our case law, one rationale for giving deference to an agency's reasonable interpretation of an ambiguous regulation is rooted in the separation of powers doctrine. *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977). More specifically, deference is warranted to prevent the judiciary from exercising excessive or potentially unconstitutional discretion over policy matters. *Id.* at 825. Such matters are properly the domain of the legislative and executive branches, which have both greater fact-finding abilities and greater political accountability than the judiciary. *See id.* However, when judicial review of an agency's interpretation of a regulation does not involve second-guessing policy decisions, the separation of powers doctrine is not a reason to defer to an agency's interpretation. To the contrary, the separation of powers doctrine compels the judiciary to ensure that other governmental bodies execute laws faithfully.

Another rationale for deferring to an agency's interpretation of a regulation arises when, unlike the judiciary, the agency has "the expertise necessary to decide technical matters." *In re Excess Surplus Status of Blue Cross & Blue Shield of Minn.,* 624 N.W.2d 264, 278 (Minn.2001). Accordingly, if the regulation refers to an open-ended technical or scientific matter— for example, a requirement that the agency determine whether certain effluents cause or contribute to a public health hazard, *see Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency,* 644 N.W.2d 457, 464 (Minn.2002) (interpreting "significant environmental effects")—then it would be appropriate to defer to the agency's interpretation, provided that interpretation is reasonable. However, when interpretation of the regulation does not implicate any special scientific or tech-

nical expertise, there is no reason to defer. In fact, when the regulation requires only a straightforward reading, it is the judiciary that possesses the special expertise.

Deference may also be appropriate "when the administrative practice at stake involves a contemporaneous construction of a statute [or regulation] by the [people] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (internal quotation marks omitted); *see also Resident v. Noot*, 305 N.W.2d 311, 312 (Minn.1981) (noting deference is appropriate "when the agency interpretation is one of long standing"); *In re Estate of Abbott*, 213 Minn. 289, 296, 6 N.W.2d 466, 469 (1942) ("That great weight should be given departmental construction of taxation statutes is dependent upon such construction's having been long continued and uniform * * *." (Citations omitted.)). In such a case, deference may be justified because longstanding and consistent interpretations may have encouraged reliance by the public and because the failure of a delegating authority to correct the interpretation implies either that the interpretation is correct or that the authority has willingly acquiesced to the agency's interpretation. *See Udall*, 380 U.S. at 17–18, 85 S.Ct. 792; *In re Estate of Abbott*, 213 Minn. at 296, 6 N.W.2d at 470. However, in cases in which the agency interpretation is recent, any reliance interest is diminished, and changed or new interpretations may be the product of political opportunism rather than good-faith efforts at interpretation.

As noted previously, no rationale for deference is present in this case. The MPCA is tasked with determining whether "construction or operation" of a new facility "will cause or contribute to the violation of water quality standards." 40 C.F.R. § 122.4(i). Water quality standards have been set and are not in dispute. *See* 33 U.S.C. § 1313 (2000). Therefore, on its face, that determination is simply a matter of measuring a known quantity—pollutants discharged—against an established standard—the water quality standards. Thus, a court's review of that determination does not require judicial second-guessing of either legislative or executive policy decisions. The only question presented is whether the policy decision made is being properly carried out. Nor does this case involve a scientific evaluation of technical or scientific matters beyond the comprehension of judges; it requires only a basic understanding of the English language and elementary number usage. Further, 40 C.F.R. § 122.4(i) was promulgated in the mid–1980s, so the regulation cannot be considered "untried and new." Moreover, an interpretation first offered by the MPCA in 2004—or by the EPA in litigation in 1999—cannot be considered "contemporaneous."

In comparison, if we were reviewing water quality standards set by the MPCA, deference would be warranted because that decision requires the evaluation of the effects of discharged substances on wildlife and public safety, which implicates special technical and scientific competence. *See Minn. Ctr. for Envtl. Advocacy*, 644 N.W.2d at 465. It would also be warranted because selecting such standards requires policy judgments involving the analysis of costs and benefits of the different options and consideration of competing interests. For example, if it were concerned with population growth, the MPCA could have presumably indexed water quality standards to population. Thus, if we were being asked to review the actual standards selected by the MPCA, considerations related to the separation of powers doctrine would make deference entirely appropri-

ate. Similarly, if we were being asked to review the MPCA's methods for measuring contaminants existing in a body of water or in effluent from a discharger, the agency's decisions would also merit deference, as those decisions would clearly require application of the agency's special scientific and technical knowledge. However, once water quality standards have been established and the appropriate measurements have been taken, neither expertise nor separation of powers should permit the MPCA latitude to redefine "cause or contribute" in order to ignore those standards.

In determining that we should defer to the MPCA's interpretation of 40 C.F.R. § 122.4(i), the court conflates the deference that might properly be accorded the MPCA in setting water quality standards with a reason to defer to the agency's interpretation of all other aspects of the regulatory scheme. In doing so, the court blurs the line between setting the standards and determining whether an action will cause or contribute to the violation of those standards, and on that basis claims that the issue before the court is both a matter of policy and a matter implicating special expertise. It is neither.

IV.

Even if it is assumed that the regulation is ambiguous and that some or all of the traditional reasons for deferring to the agency's interpretation of the regulation

are present, before deference is appropriate, the agency's interpretation must be reasonable, as a court should not allow an agency to impose a meaning on a legal authority that its text will not bear. *See St. Otto's Home*, 437 N.W.2d at 40. Here, the court determines that the MPCA's interpretation of 40 C.F.R. § 122.4(i) is reasonable without ever connecting that interpretation to the language of the regulation. Instead, the court describes the complicated analysis chosen by the MPCA to address phosphorus discharge in the NPDES permitting system and announces that these matters are within the MPCA's discretion.[2] However, if the MPCA's chosen interpretation is incompatible with the text of 40 C.F.R. § 122.4(i), the complexity of or the care taken in applying that interpretation is not helpful. Because the language of the regulation, as informed by any relevant agency expertise, is a necessary touchstone for determining the reasonableness of the interpretation, the court's failure to discuss whether and how the MPCA's interpretation is supported by the language of 40 C.F.R. § 122.4(i) undermines its reasonableness conclusion. When examined in light of the regulation's language, the interpretation of 40 C.F.R. § 122.4(i) offered by the MPCA is not reasonable.

As an initial matter, the court is mistaken when it suggests that the U.S. Supreme Court's decision in *Arkansas v. Oklahoma*,

**2.** Significantly, the MPCA's analysis for addressing phosphorus discharge in the NPDES permitting process for bodies of water in violation of water quality standards for phosphorus is not as complicated as the court implies. Further, the court misrepresents the MPCA's policy by neglecting to mention that such bodies of water appear to be exempted from the normal NPDES permitting analysis. *See* Minn. Pollution Control Agency, *MPCA Phosphorus (P) Strategy: NPDES Permits* at 1

(March 2000), *available at* http://www.pca.state.mn.us/water/pubs/phos-npdes.pdf ("For water quality segments that are impaired or threatened for phosphorus or phosphorus-related conditions as listed on the 303(d) list [i.e., in violation of water quality standards], the MPCA shall use its authority to limit point-source discharges, including existing discharges, by including phosphorus limits where appropriate in NPDES permits as part of a TDML allocation of point and/or non-point discharges.").

503 U.S. 91, 112 S.Ct. 1046, 117 L.Ed.2d 239 (1992), establishes the reasonableness of the MPCA's interpretation. First, *Arkansas v. Oklahoma* does not stand for the proposition that it is unreasonable to interpret 40 C.F.R. § 122.4(i) as prohibiting issuance of all NPDES permits in connection with waters in violation of water quality standards. *Arkansas v. Oklahoma* involved interpretation of the Clean Water Act itself, 40 C.F.R. § 122.4(d), and Oklahoma state standards requiring "no degradation of water quality." 503 U.S. at 95, 107, 112 S.Ct. 1046. It did not involve interpretation of 40 C.F.R. § 122.4(i) and the phrase "cause or contribute." While the court in *Arkansas v. Oklahoma* did hold that nothing in the Clean Water Act established a categorical ban on "any discharge of effluent that would reach waters already in violation of existing water quality standards," *id.* at 107, 112 S.Ct. 1046, the Court did not hold that the EPA was without authority to promulgate a regulation establishing a categorical ban on issuance of NPDES permits for bodies of water in violation of water quality standards. To the contrary, the court stated that the Act "vests in the EPA and the States broad authority to develop long-range, area-wide programs to alleviate and eliminate existing pollution." [3] *Id.* at 108, 112 S.Ct. 1046. The EPA used that broad authority in promulgating 40 C.F.R. § 122.4(i). Second, it does not follow from a fair reading of *Arkansas v. Oklahoma* that the pollution offset proposed for the Lake Pepin Watershed District, as advocated by the MPCA here, is reasonable.

Moreover, there is nothing in the text of 40 C.F.R. § 122.4(i) that suggests that one discharger may be allowed to increase its allowable discharge simply because another discharger has taken steps to reduce its discharge. In addition, the MPCA's interpretation appears to be in conflict with the goals of both the NPDES permitting scheme and the Clean Water Act, under which the NPDES permit system operates. I presume that elimination of pollutant discharge is a goal of the National *Pollutant Discharge Elimination System,* and the purpose of the Clean Water Act "is to *restore* and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) (2000) (emphasis added); *see also* 33 U.S.C. § 1251(b) (2000) ("It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to *prevent, reduce, and eliminate* pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter." (Emphasis added.)). In contrast, the MPCA's interpretation of 40 C.F.R. § 122.4(i), which permits discharge offsets, is not limited in either time or place. Under this interpretation, presumably the MPCA may consider offsets based on discharge reductions from the distant past and unknown future as well as from geographically distant locales, which would largely circumvent any mandate to improve water quality and re-

---

**3.** I note that the MPCA's interpretation of 40 C.F.R. § 122.4(i) does nothing to "alleviate and eliminate existing pollution." To the contrary, because there is no indication that the reduction in phosphorus discharge from the Litchfield facility is contingent on approval of the permit for the Annandale/Maple Lake facility, the MPCA's interpretation will result in increased pollution. Moreover, while the

Court in *Arkansas v. Oklahoma* expresses concern about "frustrat[ing] the construction of new plants that would improve existing conditions," *see* 503 U.S. at 108, 112 S.Ct. 1046, denial of a NPDES permit in this case will do nothing to prevent construction of facilities that, unlike the proposed Annandale/Maple Lake facility, will actually improve water quality.

duce pollution. To hold that the MPCA's interpretation is reasonable is to hold that reading the "cause or contribute" language out of 40 C.F.R. § 122.4(i) is also reasonable. It is also to hold that the MPCA has unfettered discretion to issue permits allowing polluters to cause or contribute to violations of water quality standards. But none of these holdings are reasonable. Thus, I conclude that the MPCA's interpretation of 40 C.F.R. § 122.4(i) in this case is not reasonable.

### V.

In summary, 40 C.F.R. § 122.4(i) is not ambiguous, there are no factors present in this case that would indicate that deference to the MPCA's interpretation of the regulation is appropriate, and the MPCA's interpretation of the regulation is not reasonable. Accordingly, I would affirm the court of appeals' reversal of the MPCA's decision to issue the NPDES permit.

MEYER, Justice (dissenting).

I join in the dissent of Justice Page.